In the

# United States Court of Appeals

### For the Seventh Circuit

No. 10-3523

RICK ALEMAN,

*Plaintiff-Appellant*,

*v.*

VILLAGE OF HANOVER PARK, *et al.*,

*Defendants-Appellees*.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 07 C 5049—**Elaine E. Bucklo**, *Judge*.

ARGUED SEPTEMBER 26, 2011—DECIDED NOVEMBER 21, 2011

Before CUDAHY, POSNER, and WOOD, *Circuit Judges*.

POSNER, *Circuit Judge*. The plaintiff in this suit under
42 U.S.C. § 1983 appeals from the grant of summary
judgment in favor of the defendants—two Illinois state
police officers (Gerard Fallon and Joseph Micci), three
police officers of the Village of Hanover Park, Illinois
(Todd Carlson, Carol Lussky, and Eric Villanueva), and the
Village itself. The suit, which seeks damages, charges
the individual defendants with having twice falsely

arrested the plaintiff, Rick Aleman, in violation of the Fourth Amendment's prohibition of unreasonable seizures, and having questioned him in violation of the *Miranda* rule, eliciting spurious evidence that led to his second arrest and an indictment for murder. There are also supplemental claims under Illinois law, but only one—malicious prosecution—remains in the case; the district judge dismissed the others as barred by the applicable statute of limitations, and Aleman doesn't challenge those dismissals.

We also won't have to discuss the Village's liability. The Village was not implicated in the alleged misbehavior of its officers and cannot in a section 1983 suit be held liable just by virtue of having been the officers' employer. *Monell v. Department of Social Services*, 436 U.S. 658, 691 (1978). So without further ado we affirm the district court's grant of summary judgment in its favor.

We shall state the facts as favorably to the plaintiff as the record permits, as we are required to do when deciding an appeal from a grant of summary judgment in favor of the defendants. We don't vouch for the truth of the facts that the plaintiff alleges, though there doesn't seem to be much doubt that his main factual allegations are true.

Aleman provided day care in his home. His day-care service was only five months old when the events out of which this case arises took place. But there is no contention that he lacked the requisite competence. He had five children of his own, ranging in age from 3 to 15; and several of the younger ones were in his day care along

with three other children, one of whom was an 11-month-old named Joshua Schrik. We'll see that Aleman knew how to perform CPR on infants.

On the morning of September 9, 2005, Joshua's mother, Danielle Schrik, dropped off Joshua at Aleman's home for his third day of day care. During the first two days Joshua had been lethargic and feverish. On September 9 he was much worse. Shortly after arriving he began gasping for air, then collapsed; the alarmed Aleman picked him up and, because the infant was showing no signs of life, shook him gently in an effort to elicit a response. There was none. After performing CPR with no effect except to bring fluids out of Joshua's nose and mouth, Aleman called 911. An ambulance arrived and took the child to a hospital.

Police officers arrived at Aleman's home about when the ambulance did and questioned him. One of them, Officer Lussky (a defendant), asked him and his wife to come down to the police station. They did so. Aleman was placed in an interrogation room. Forty-five minutes later, no interrogation having taken place, he asked Lussky whether he could leave and come back in an hour. She said no; he was under arrest—and the arrest activated his *Miranda* rights. *Oregon v. Mathiason*, 429 U.S. 492, 494-95 (1977) (per curiam).

More than five hours later, Officers Micci and Villanueva (two other defendants) entered the interrogation room in which Aleman was being detained and Micci told him he'd talked to several people about what had happened to Joshua and that Aleman had "the most

information." Aleman said he wanted to call his lawyer. Micci responded by beginning to fill out a waiver of *Miranda* rights for Aleman to sign, and minutes later said to him "before I talk to you I would like this [the waiver] signed" but that Aleman could call his lawyer first. Aleman called and during the phone conversation Villanueva picked up the phone and spoke to the lawyer, who told him that Aleman was invoking his right to remain silent. That did not count as an invocation of Aleman's *Miranda* rights, however; the Supreme Court has held that they can be invoked only by the person being questioned. *Moran v. Burbine*, 475 U.S. 412, 433 n. 4 (1986).

After the phone call ended, Micci asked Aleman, "How we doing?" and Aleman replied, "Not good. I called him and he told me not to do this right now." Aleman added that he was tired and wanted to go home, but Micci responded: "If I don't get to talk to you, you're not going home." He also told him that if he talked to the two officers he could "help [him]self out" and "clear this up."

Aleman asked whether he could speak to his lawyer again and the officers said he could. In this call Aleman told the lawyer "I wish you were here" and "I need your help . . . . I can't help myself in here." Aleman was permitted to make additional calls, and reached his mother and a friend after failing to reach his wife, but eventually the officers said: "Hang up the phone, Rick, and have a seat. And I ask that you don't use the phone until we decide what we're gonna do." Aleman responded: "I talked to my lawyer, you know, and I tried to talk him

into doing it, and he told me to go ahead . . . . I really don't have a problem doing it." (If that's indeed what the lawyer said—his end of the conversation was not recorded—he violated Justice Jackson's dictum that "any lawyer worth his salt will tell the suspect in no uncertain terms to make no statement to police under any circumstances." *Watts v. Indiana*, 338 U.S. 49, 59 (1949) (separate opinion).) Micci followed up by again asking Aleman to sign the waiver. He did so and the officers then questioned him for four hours.

During the interrogation Micci repeatedly told Aleman that he'd talked to three doctors and all had told him that Joshua had been shaken in such a way that he would have become unresponsive (unconscious) immediately, meaning that Aleman's shaking must have caused Joshua's injury, since Joshua was sluggish but conscious when he arrived at Aleman's home that morning. This account of what the doctors had said was a lie, but it elicited from Aleman the statement that "I know in my heart that if the only way to cause [the injuries] is to shake that baby, then, when I shook that baby, I hurt that baby . . . . I admit it. I did shake the baby too hard." Yet intermittently throughout the protracted interrogation he continued to deny, and express disbelief, that he could have caused the injury.

Partly on the basis of his supposed "confession," Aleman was charged with aggravated battery of a child. Officer Carlson (another defendant, of whom more shortly) prepared the charge, Villanueva signed the criminal complaint, and at the subsequent bond hearing the prose-

cutors, repeating what the officers had told them, told the judge that Aleman had confessed to violently shaking Joshua and causing his injuries.

Joshua died on September 13. The charge against Aleman was upped to first-degree murder and he was rearrested on September 15 and later indicted. He made bail, as he had done after his original arrest. Oddly, we've been unable to determine with certainty how long he spent in jail. At his deposition he said a month; at oral argument his lawyer said eight or nine days. But the length of time that Aleman was in jail, while relevant to the amount of damages that he might be able to obtain if he wins this case, is irrelevant to this appeal.

The case against him quickly disintegrated. A prosecutor viewing the videotape of the interrogation by Micci and Villanueva decided that it was "more exculpatory than inculpatory," and that it also raised issues under *Miranda*. The doctors who had examined Joshua, and diagnosed him with subdural hematoma (bleeding in the brain, usually the result of a head injury), eventually decided that the infant's sluggish and feverish condition for several days *before* September 9 could have been caused by a violent shaking or by a blow to the head, and that Joshua's collapse on September 9 could have been the delayed effect of this earlier trauma rather than of anything Aleman had done—in fact Aleman's mild shaking of Joshua was the proper initiation of CPR. U.S. National Library of Medicine, *Medline Plus*, "CPR - infant," www.nlm.nih.gov/medlineplus/ency/article/000011.htm (visited November 16, 2011), summarizing M.F. Hazinski, R. Samson & S. Schexnayder, "2010 Handbook of Emer-

gency Cardiovascular Care for Healthcare Providers" (American Heart Association 2010).

This explanation was accepted by an experienced investigator employed by the Illinois Department of Children and Family Services, Michael Booker, who had discovered that Joshua's mother was a violent person with a criminal record. She was known to have beaten and violently shaken Joshua and had been heard to make threats to kill him. Although the medical profession once thought that there is no interim between trauma and collapse in shaken-baby syndrome, the medical profession now believes (and apparently believed in 2005—Booker certainly believed this) that there can be an interim in which the child would be conscious, but probably lethargic or fussy or feverish or have difficulty sleeping or eating. See Emily Bazelon, "Shaken-Baby Syndrome Faces New Questions in Court," *New York Times Magazine*, Feb. 6, 2011, p. MM30; *State v. Edmunds*, 746 N.W.2d 590, 596 (Wis. App. 2008); Kristy B. Arbogast, Susan S. Margulies & Cindy W. Christian, "Initial Neurologic Presentation in Young Children Sustaining Inflicted and Unintentional Fatal Head Injuries," 116 *Pediatrics* 180 (2005). Thus one of the doctors who treated Joshua after his collapse explained that when he told the police that Joshua would not have been alert and functioning after the injury, he meant that Joshua would not have been behaving like a normal 11-month-old, not that he would have been unconscious.

Aleman was never tried. On November 13, 2006—more than a year after his arrests and Joshua's death—the

charges against him were dismissed. Danielle Schrik, the mother, was never charged.

Carlson, who played the central role in screwing up the investigation (quite possibly deliberately, as we're about to see), had been dispatched to the hospital immediately after Joshua was taken there on September 9, to interview Joshua's family and the doctors who were caring for him. He asked Danielle whether she had ever struck Joshua and she said no, although she acknowledged that he'd had a fever in the days leading up to his collapse. This should have been a warning that his collapse on September 9 might have been caused by a blow or a shaking several days earlier that had first manifested itself in his fever and lethargy, as Booker recognized when he learned of the fever. Nevertheless Carlson decided he would investigate Danielle Schrik no further. From his subsequent conduct in attempting to protect her from questioning by Booker and in holding her hand and sobbing with her at Joshua's funeral, a reasonable jury might infer that he was sexually attracted to her and for that reason wanted to keep the investigation focused on Aleman.

When Booker, the expert on child abuse, learned of Carlson's decision to terminate the investigation of Danielle, he was disturbed and on September 13, the day of Joshua's death, interviewed Danielle in Carlson's presence. She acknowledged some of her criminal background, which included crimes of violence, but not all of it. According to statements by her mother and her boyfriend, Danielle had broken her mother's jaw and threatened to kill her and Joshua; she had had physical fights

with Joshua's father and been arrested and charged with battery during one of those fights; and her mother had seen her shake Joshua frequently and the mother's boyfriend had had to protect the child from Danielle.

Carlson told Danielle not to speak to Booker or any other investigator, and when Booker repeatedly tried to call her after the initial interview there was never a response.

At Joshua's autopsy on September 14, which both Booker and Carlson attended, the pathologist opined, according to Booker's notes, that it was "highly unlikely" that Joshua's injuries had been caused by Aleman, since the symptoms Joshua had displayed in the days before his collapse were consistent with his already having a subdural hematoma. But later that day Carlson returned to the pathologist's office alone and told her that Joshua had been "behaving normally" when he arrived at Aleman's house on the ninth and indeed was "up and running around." These lies caused her to change her opinion and she told the prosecutor that the injury to Joshua's head had occurred while he was in Aleman's care. On the basis of this misinformation the prosecutor approved charging Aleman with murder, and Carlson signed the criminal complaint and arrested him. After eventually learning the truth, the pathologist reinstated her original opinion of the cause of Joshua's hematoma and subsequent death.

The district judge was correct to rule that the arrest of Aleman on the morning of September 9 when he

was told he couldn't leave the police station was supported by probable cause. It was natural for the police to suspect him, as he was the last person to have had custody of Joshua and admitted having shaken him. By the time he was arrested the hospital had informed the police that they'd diagnosed Joshua's hematoma and believed him to be a victim of shaken-baby syndrome. Police interviewed the doctors, who told them, misleadingly (as they all later admitted), that the injury had been freshly caused—the doctor who used the term "fresh" later explained that "fresh" meant "within about a week," but the police quite naturally interpreted it to mean "today." And immediately after Joshua was taken away in the ambulance, Aleman had been heard to say "at least twice that he did not want to go to jail for the rest of his life and did not want to be unable to see his children." The fact that Carlson's interview of Joshua's mother had been perfunctory and that he may already have been trying to protect her for reasons of "lust" (as Aleman's brief puts it) is irrelevant; the test for probable cause abstracts from the state of mind of the arresting officer. *Whren v. United States*, 517 U.S. 806, 812-13 (1996).

The second arrest, the arrest for murder, is a different matter. Had Carlson not lied to the pathologist and obstructed Booker's efforts to investigate Danielle, the prosecutor would have had no basis for charging Aleman with murder or any other crime, and so Aleman would not have been rearrested. For without Carlson's obstruction of justice the pathologist's evaluation would have tended to exonerate Aleman, and Booker's investigation of Danielle would have identified her as

far more likely to have been Joshua's killer than Aleman. And without improper tactics by the police at Aleman's interrogation (discussed next), there would have been no "confession" to provide evidence of his guilt. In sum, the police lacked probable cause to arrest Aleman the second time, and so that arrest violated the Fourth Amendment. *Sroga v. Weiglen*, 649 F.3d 604 (7th Cir. 2011).

So clear is the absence of probable cause that Carlson cannot take shelter in the doctrine of qualified immunity, which provides a defense if a reasonable officer could have mistakenly believed that probable cause existed. *Wollin v. Gondert*, 192 F.3d 616, 621 (7th Cir. 1999). A reasonable officer knowing what Carlson knew would not have thought that Aleman was probably Joshua's killer.

Whether the interrogation of Aleman violated *Miranda* is a separate question. The district judge ruled that it did not because the officers might reasonably have believed that Aleman had waived his *Miranda* rights.

If and when Aleman invoked his right to counsel, Micci and Villanueva were required to stop questioning him. "[W]hen an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established *by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights*. We further hold that an accused . . ., having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, ex-

changes, or conversations with the police." *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981) (emphasis added; footnote omitted); see also *Miranda v. Arizona*, 384 U.S. 436, 474 (1966); *Davis v. United States*, 512 U.S. 452, 458-59 (1994).

Aleman indicated a desire for the assistance of counsel twice, and only after responding to further police-initiated custodial interrogation did he agree to be questioned. He said first "I gotta call my guy" (his lawyer) and after speaking to him reported that the lawyer had told him not to speak to the police—yet Micci continued to urge him to sign a *Miranda* waiver. Aleman invoked his right to counsel the second time when he asked to call his lawyer again. He might have done so a third time, but was prevented when Micci or Villanueva told him to hang up and added, "I ask that you don't use the phone again until we decide what we're gonna do." When a suspect invokes his right to counsel, the police may not recommence questioning unless the suspect's lawyer is present or the suspect initiates the conversation himself. *Minnick v. Mississippi*, 498 U.S. 146, 151-52 (1990).

Instead of shutting up after Aleman sought his lawyer's aid, the officers, exploiting his distraught state, badgered him to waive his *Miranda* rights, as in *Minnick v. Mississippi, supra*, 498 U.S. at 148-52, *Smith v. Illinois*, 469 U.S. 91, 92-93, 98-99 (1984) (per curiam), and *United States v. Lee*, 413 F.3d 622, 624, 627 (7th Cir. 2005). In *Minnick* the police left off questioning the suspect after he asked to speak to his lawyer, and allowed him to consult with the lawyer. But then a police officer came by and questioned

him outside the lawyer's presence, and the Supreme Court ruled that this was a violation of *Miranda* and *Edwards* because it was not true that "the protection [conferred by] *Edwards* terminates once counsel has consulted with the suspect. In context, the requirement that counsel be 'made available' to the accused refers to more than an opportunity to consult with an attorney outside the interrogation room." 498 U.S. at 151-52.

The defendants argue that Aleman's invocation of his right to counsel was ambiguous and therefore ineffectual, as in *Davis v. United States*, *supra*, 512 U.S. at 459. But invocation just requires a "statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney," *id.*, and we have held that there was no ambiguity when a suspect said, "I think I should call my lawyer." *United States v. Lee*, *supra*, 413 F.3d at 626; see also *Lord v. Duckworth*, 29 F.3d 1216, 1219-21 (7th Cir. 1994). It's true that "am I *going to be able* to get an attorney?" was held ambiguous and hence ineffectual in *United States v. Shabaz*, 579 F.3d 815, 819 (7th Cir. 2009) (emphasis in original), but this case is closer to *Lee* than to *Shabaz*. Anyway the defendants' argument comes too late; they forfeited it by failing to make it in the district court.

The *Miranda* rule is intended to backstop the right conferred by the Fifth Amendment not to be compelled to incriminate oneself, by excluding from the defendant's trial the confession that the violation enabled the police to elicit when upon arresting they questioned him. Aleman was never tried. But the statement he made to the officers who questioned him was used against

him in a criminal proceeding—it was an indispensable ground of his indictment for murder, and thus made the violation of *Miranda* actionable in a suit under section 1983. *Sornberger v. City of Knoxville*, 434 F.3d 1006, 1026-27 (7th Cir. 2006); see also *Stoot v. City of Everett*, 582 F.3d 910, 925 (9th Cir. 2009); *Higazy v. Templeton*, 505 F.3d 161, 173 (2d Cir. 2007).

There is more that was wrong with the interrogation than a violation of *Miranda*. *Miranda* has been said to distract judges from the propriety of the interrogation that follows a waiver of *Miranda* rights. See William J. Stuntz, *The Collapse of American Criminal Justice* 235 (2011). This case is an illustration. Micci induced Aleman's "confession" by lying to him about the medical reports. The lies convinced Aleman that he must have been the cause of Joshua's shaken-baby syndrome because, according to Micci, the doctors had excluded any other possibility. (They had not.) The key statement in Aleman's "confession" was that "if the only way to cause [the injuries] is to shake that baby, then, when I shook that baby, I hurt that baby." The crucial word is "if." By lying about the medical reports, Micci changed "if" to "because" and thereby forced on Aleman a premise that led inexorably to the conclusion that he must have been responsible for Joshua's death; the lie if believed foreclosed any other conclusion.

Courts have been reluctant to deem trickery by the police a basis for excluding a confession on the ground that the tricks made the confession coerced and thus involuntary. See *Frazier v. Cupp*, 394 U.S. 731, 739 (1969);

*Holland v. McGinnis*, 963 F.2d 1044, 1050-52 (7th Cir. 1992); *United States v. Velasquez*, 885 F.2d 1076, 1088-89 (3d Cir. 1989); *State v. Kelekolio*, 849 P.2d 58, 71-74 (Haw. 1993). In *United States v. Rutledge*, 900 F.2d 1127, 1130-31 (7th Cir. 1990), a police officer's statement to a suspect could be interpreted as promising "a *net* benefit from spilling the beans," and we said that "if this was the promise, it is unlikely that the officer intended to keep it; and if he did not, then the statement was fraudulent. But it was the sort of minor fraud that the cases allow. Far from making the police a fiduciary of the suspect, the law permits the police to pressure and cajole, conceal material facts, and actively mislead—all up to limits not exceeded here" (emphasis in original). The confession must be excluded only "if the government feeds the defendant false information that seriously distorts his choice, [for example] by promising him that if he confesses he will be set free"—in other words, only if "the false statement destroyed the information that he required for a rational choice." *Id*. at 1129-30.

In this case a false statement did destroy the information required for a rational choice. Not being a medical expert, Aleman could not contradict what was represented to him as settled medical opinion. He had shaken Joshua, albeit gently; but if medical opinion excluded any other possible cause of the child's death, then, gentle as the shaking was, and innocently intended, it *must* have been the cause of death. Aleman had no rational basis, given his ignorance of medical science, to deny that he had to have been the cause.

The question of coercion is separate from that of reliability. A coerced confession is inadmissible (and this apart from *Miranda*) even if amply and convincingly corroborated. *Rogers v. Richmond*, 365 U.S. 534, 540-41 (1961); *Johnson v. Trigg*, 28 F.3d 639, 641 (7th Cir. 1994); *Parker v. Allen*, 565 F.3d 1258, 1280 (11th Cir. 2009). But a trick that is as likely to induce a false as a true confession renders a confession inadmissible because of its unreliability even if its voluntariness is conceded. See, e.g., *Johnson v. Trigg, supra*, 28 F.3d at 641. If a question has only two answers—*A* and *B*—and you tell the respondent that the answer is not *A*, and he has no basis for doubting you, then he is compelled by logic to "confess" that the answer is *B*. That was the vise the police placed Aleman in. They told him the only possible cause of Joshua's injuries was that he'd been shaken right before he collapsed; not being an expert in shaken-baby syndrome, Aleman could not deny the officers' false representation of medical opinion. And since he was the only person to have shaken Joshua immediately before Joshua's collapse, it was a logical necessity that he had been responsible for the child's death. Q.E.D. A confession so induced is worthless as evidence, and as a premise for an arrest. *Crowe v. County of San Diego*, 608 F.3d 406, 433 (9th Cir. 2010); *Wilkins v. DeReyes*, 528 F.3d 790, 800-01 (10th Cir. 2008).

We turn finally to the charge of malicious prosecution, governed by Illinois law as expounded in such cases as *Swick v. Liautaud*, 662 N.E.2d 1238, 1242 (Ill. 1996); *Porter v. City of Chicago*, 912 N.E.2d 1262, 1265 (Ill. App. 2009),

and *Gonzalez v. City of Elgin*, 578 F.3d 526, 541-42 (7th Cir. 2009).

Villanueva cannot be said to have lacked probable cause in preparing the charge of aggravated battery merely because he based the charge in part on the worthless "confession" that he and Micci (the latter the lead interrogator) had extracted from Aleman. There was sufficient other evidence at this early point in the investigation to charge aggravated battery. And Illinois law requires to show malicious prosecution proof not only of lack of probable cause but also of "malice," which means in this context that the officer who initiated the prosecution had "any motive other than that of bringing a guilty party to justice." *Carbaugh v. Peat*, 189 N.E.2d 14, 19 (Ill. App. 1963); see also *Rodgers v. Peoples Gas, Light & Coke Co.*, 733 N.E.2d 835, 842 (Ill. App. 2000); *Mack v. First Security Bank*, 511 N.E.2d 714, 717 (Ill. App. 1987); *Robinson v. Econ-O-Corporation, Inc.*, 379 N.E.2d 923, 925 (Ill. App. 1978). *Rodgers* and *Mack* permit an inference of malice to be drawn from an absence of probable cause. But the events that demolished probable cause to charge Aleman—Booker's questioning of Danielle Schrik and the pathologist's statement that it was highly unlikely that Joshua's hematoma had been caused by something that happened on September 9 rather than earlier—took place after Villanueva submitted the charge of battery.

Only Carlson is charged with malicious prosecution of the murder charge, for which probable cause had evaporated. A reasonable jury could find that Carlson

by this point thought Joshua's mother probably the murderer and was trying to protect her by throwing the mantle of guilt on Aleman, or at least that he wanted to spare her the anxiety of being a suspect and, not incidentally, get in her good graces by doing so, by terminating the investigation of her and pinning the murder on Aleman. (If you want to exonerate one suspect, it helps to have another.) Such motives could not be thought proper.

We cannot find any evidence of misconduct on the part of Officer Fallon (another defendant), who participated in the arrest of Aleman for murder pursuant to the warrant based on Carlson's representations; nothing in the warrant would have alerted Fallon to its invalidity. Nor can we find evidence of misconduct by Lussky; the first arrest—the only act Aleman challenges in which she participated—was supported by probable cause.

In summary, we affirm the dismissal of all claims against Lussky, Fallon, and the Village; the first false-arrest claim; and the malicious prosecution claim against Villanueva. But we reverse the dismissal of the claim of unlawful interrogation against Micci and Villanueva, of the second false-arrest claim against Carlson, and of the claim against Carlson of malicious prosecution for murder, and we remand the case for further proceedings consistent with this opinion.

AFFIRMED IN PART, REVERSED IN PART,
and REMANDED.