*This opinion is subject to revision before final publication in the Pacific Reporter*

**2018 UT 49**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

STATE OF UTAH,
*Appellee,*

*v.*

GREGORY TODD FULLERTON,
*Appellant.*

No. 20170113
Filed September 11, 2018

Fifth District, Washington County
The Honorable Pamela G. Heffernan
No. 081501299

Attorneys:

Sean D. Reyes, Att'y Gen., Christopher D. Ballard, Asst. Solic.
Gen., Salt Lake City, Ryan J. Shaum, St. George,
for appellee

Gary W. Pendleton, St. George, for appellant

JUSTICE HIMONAS authored the opinion of the Court, in which
CHIEF JUSTICE DURRANT, ASSOCIATE CHIEF JUSTICE LEE,
JUSTICE PEARCE, and JUSTICE PETERSEN joined.

JUSTICE HIMONAS, opinion of the Court:

## INTRODUCTION

¶1    Gregory Fullerton was convicted of child abuse homicide after his girlfriend's son suffered fatal brain hemorrhages while in his care. Attempting to exclude the interview he had given to the police, Mr. Fullerton filed a motion to suppress on the grounds that the interview violated his *Miranda* rights and that the confession he gave was not voluntary. The district court denied Mr. Fullerton's motion, and he challenges that ruling on appeal. Additionally, Mr. Fullerton raises four challenges to expert testimony provided in his case and alleges that the prosecutor violated his due process rights during closing arguments.

¶2   We decline to consider Mr. Fullerton's challenges to the expert testimony because three of them were unpreserved, and he received the only remedy he requested from the trial court on the fourth. We likewise determine that his due process challenge is unpreserved and do not reach that issue. Conversely, we do consider Mr. Fullerton's appeal of the denial of his motion to suppress. We conclude that his confession was voluntary and that he was not in custody for purposes of *Miranda* and therefore affirm the district court on these issues.

¶3   However, we take this opportunity to clarify that because *Miranda* is a matter of federal jurisprudence, our courts must be in lockstep with the United States Supreme Court on whether an individual is in custody for purposes of *Miranda*. We therefore rebuke sole reliance on the factors we set forth in *Salt Lake City v. Carner*, 664 P.2d 1168 (Utah 1983), for this determination and clarify the role these factors play going forward.

## BACKGROUND

¶4   In the early evening of July 23, 2008, Mr. Fullerton was entrusted with the care of N.L., his girlfriend's three-month-old son.[1] A short time later, Mr. Fullerton entered the bedroom where N.L.'s step-grandfather was watching television and announced that something was wrong with N.L.—the baby was limp and struggling to breathe.

¶5   Mr. Fullerton called 911 and attempted to resuscitate N.L. The responding officer performed CPR on N.L. until paramedics arrived and transported him to Dixie Regional Medical Center. There, Dr. Adrianne Walker discovered that N.L. had suffered a subdural hematoma, brain swelling, and likely retinal hemorrhaging. Dr. Walker informed Detective Adam Olmstead of

---

[1] "In reviewing the trial court's ruling [on a motion to suppress], we recite the facts in the light most favorable to the trial court's findings." *State v. Anderson*, 910 P.2d 1229, 1230 (Utah 1996); *see also State v. Brandley*, 972 P.2d 78, 79 (Utah Ct. App. 1998) ("[W]hen reviewing the denial of a motion to suppress, we recite the facts in a light most favorable to the trial court's findings." (citation omitted) (internal quotation marks omitted)). "On appeal from a jury verdict, we recite the facts in the light most favorable to that verdict." *State v. Diaz*, 859 P.2d 19, 20 (Utah 1993).

the St. George City Police Department that she suspected N.L. had been violently shaken, but further medical investigation was needed.

¶6 After speaking with Dr. Walker, Detective Olmstead had another officer call Mr. Fullerton and ask him to come to the police station for questioning. Mr. Fullerton's father drove him to the police station and waited in the parking lot. Officer Joe Watson told Mr. Fullerton that he was not under arrest and directed him to an interview room. Captain Barry Golding arrived and closed, but did not lock, the door of the interview room. After a short introduction, the following exchange occurred:

> Q. I need to make sure you understand a couple of things, okay? One, you're not under arrest.
>
> A. I know that.
>
> Q. You know that?
>
> A. Yes.
>
> Q. Okay. . . . but we need to figure out what happened, okay? What I want to clarify with you is that you understand your father is out back. You come in here voluntarily. We want to talk to you. You're free to leave at any time. Do you understand that?
>
> A. Yeah. I do.
>
> Q. So if you tell me you want to walk, that's okay. We'll deal with that.
>
> A. Okay.

Captain Golding then told Mr. Fullerton that he wanted "to talk and talk and talk until we figure this thing out, okay?"

¶7 Detective Olmstead arrived, and for the following ninety minutes either he or Captain Golding questioned Mr. Fullerton. The officers were never in the interrogation room at the same time. They were dressed in plain clothes and came and went from the interview room several times. As far as Mr. Fullerton knew,

the door remained unlocked at all times.[2] At no point did the officers physically restrain Mr. Fullerton or raise their voices. Nor did they recite to Mr. Fullerton the *Miranda* warnings.

¶8 The officers initially couched their questioning in friendly, non-accusatory terms such as "something happened in there where the baby went unresponsive. And that's . . . the time frame . . . we need to kind of lock down, okay?" However, Mr. Fullerton offered an evolving version of events: he simply rolled the baby over and the baby stopped breathing; perhaps a stranger entered the room while he was in the bathroom; he had dropped the baby; he had a "freeze" related to his Parkinson's Disease and "fumbled" the baby. As the inconsistencies in his story became apparent, the officers took on a more accusatory tone. Mr. Fullerton then stated that he had "pushed on [N.L.'s] back" and "something cracked." He said, "But now I'll probably go to jail and everything else." Detective Olmstead neither confirmed nor refuted this statement. Detective Olmstead left and Captain Golding entered the room and said that Mr. Fullerton's story still could not account for N.L.'s injuries. He eventually told Mr. Fullerton, "We know that you're accountable; we know that you're responsible."

¶9 Mr. Fullerton repeatedly denied "shaking" N.L. but eventually confessed that he had "tossed him around" and repeatedly "flip-flopped him over" with enough force that the baby was lifted off the bed and landed on his head. He said that N.L. then rolled over, closed his eyes, and became unresponsive. Shortly after this admission, Captain Golding said, "But you remember when I told you about—that you weren't in custody? That your father brought you in? We need—we need to decide what to do at this point, okay?"[3] Mr. Fullerton was then officially arrested and charged with child abuse.

---

[2] The door became locked at some point near the end of the interview, but this fact was unknown to both Mr. Fullerton and Captain Golding.

[3] The district court found Mr. Fullerton to be in custody at this point and suppressed any further statements made during the interview.

¶10 Meanwhile, N.L. was flown to Primary Children's Medical Center, where he later died. Dr. Karen Hansen, a pediatrician at Primary Children's, diagnosed N.L. with subdural and subarachnoid hemorrhages on both sides of his brain, brain swelling, retinal hemorrhages, and retinal (macular) folds in both eyes. After learning of N.L.'s death, the State charged Mr. Fullerton with child abuse homicide, a first-degree felony. Before trial, Mr. Fullerton moved to suppress his police interview on the grounds that officers did not give him the *Miranda* warnings and allegedly used impermissible interrogation tactics. The district court denied the motion. A jury found Mr. Fullerton guilty and he was sentenced to a term of five years to life in prison.

¶11 Mr. Fullerton appeals his conviction, claiming that the district court incorrectly denied his motion to suppress, improperly allowed certain expert testimony, and that he was denied due process of law as a result of prosecutorial misconduct. We have jurisdiction pursuant to Utah Code section 78A-3-102(3)(i).

**STANDARD OF REVIEW**

¶12 We review a trial court's determination of custodial interrogation for *Miranda* purposes for correctness. *State v. Levin*, 2006 UT 50, ¶ 46, 144 P.3d 1096.

¶13 "In reviewing a trial court's determination on the voluntariness of a confession, we apply a bifurcated standard of review." *State v. Mabe*, 864 P.2d 890, 892 (Utah 1993). Under this standard, "the ultimate determination of whether a confession is voluntary is a legal question, and we review the trial court's ruling for correctness." *Id.* (citing *Arizona v. Fulminante*, 499 U.S. 279, 287 (1991); *State v. Thurman*, 846 P.2d 1256, 1270 n.11 (Utah 1993)). We set aside factual findings made by the district court only if they are clearly erroneous. *Id.*

¶14 "The trial court has wide discretion in determining the admissibility of expert testimony, and such decisions are reviewed under an abuse of discretion standard." *State v. Hollen*, 2002 UT 35, ¶ 66, 44 P.3d 794 (citation omitted). Therefore, "we will not reverse [a decision to admit or exclude expert testimony] unless the decision exceeds the limits of reasonability." *Id.* (alteration in original) (citation omitted).

## ANALYSIS

### I. LACK OF *MIRANDA* WARNINGS

¶15 Because he did not receive the *Miranda* warnings prior to making his confession to police, Mr. Fullerton contends that the district court erroneously denied his motion to suppress the confession. We begin by discussing the relevant standards for determining when a *Miranda* warning is necessary. Then we turn to whether the district court erred in determining that Mr. Fullerton was not entitled to *Miranda* warnings, consequentially denying his motion to suppress.

### *A. When* Miranda *Warnings Are Required*

¶16 The Fifth Amendment to the United States Constitution provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V. In *Malloy v. Hogan*, the United States Supreme Court applied this protection to the states via the Fourteenth Amendment. 378 U.S. 1, 6 (1964).

¶17 Two years later, in the landmark case of *Miranda v. Arizona*, the Court established significant procedural safeguards against self-incrimination for suspects in police custody. 384 U.S. 436 (1966). The Court explained that "the constitutional foundation underlying the privilege" against self-incrimination is an "essential mainstay of our adversary system," and "require[s] the government 'to shoulder the entire load'" of producing evidence against a defendant. *Id.* at 460 (citation omitted). "[T]o respect the inviolability of the human personality," the government must "produce the evidence . . . by its own independent labors" and may not extract such evidence from a person "by the cruel, simple expedient of compelling it from his own mouth." *Id.* (citing *Chambers v. Florida*, 309 U.S. 227, 235–38 (1940)).

¶18 The Court held "that without proper safeguards the process of in-custody interrogation of persons suspected or accused of crime contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." *Id.* at 467. In such an environment, "no statement obtained from the defendant can truly be the product of his free choice." *Id.* at 458. To counteract these pressures and safeguard a suspect's constitutional protection against self-incrimination, he must be given a *Miranda* warning prior to any questioning. *Id.* at 479. That

warning must inform the suspect that "he has the right to remain silent," "anything he says can be used against him in a court of law," "he has the right to the presence of an attorney," and "if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Id.*

¶19 These *Miranda* safeguards apply "when an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning." *Id.* at 478. In 1983, we adopted four factors that we deemed the "*most important* factors in determining whether an accused who has not been formally arrested is in custody." *Salt Lake City v. Carner*, 664 P.2d 1168, 1171 (Utah 1983) (emphasis added). These "*Carner* factors" include "(1) the site of the interrogation; (2) whether the investigation focused on the accused; (3) whether objective indicia of arrest were present; and (4) the length and form of interrogation." *Id.*

¶20 The district court relied on the *Carner* factors when analyzing Mr. Fullerton's motion to suppress. And Mr. Fullerton uses these factors to challenge the district court's determination that he was in custody. However, the State contests rigid reliance on these factors, arguing that they are out of step with the federal totality of the circumstances standard and urging us to abandon *Carner*.

¶21 To a certain extent, we agree with the State. The United States Supreme Court has recently made the two-step test for the custody analysis clear. To determine whether a person is in custody for the purposes of *Miranda*, "the initial step is to ascertain whether, in light of the objective circumstances of the interrogation, a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave." *Howes v. Fields*, 565 U.S. 499, 509 (2012) (alteration in original) (citations omitted) (internal quotation marks omitted). If "an individual's freedom of movement was curtailed," the focus turns to "whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *Id.*

¶22 The first part of this inquiry—whether a reasonable person would have felt free to leave—requires "examin[ing] all of the circumstances surrounding the interrogation" to determine "how a suspect would have gauge[d] his freedom of movement." *Id.* (second alteration in original) (citations omitted) (internal

quotation marks omitted). Declining to "demarcate a limited set of relevant circumstances," the United States Supreme Court requires courts to look at "all of the circumstances surrounding the interrogation, including any circumstance that would have affected how a reasonable person in the suspect's position would perceive his or her freedom to leave." *J.D.B. v. North Carolina*, 564 U.S. 261, 270–71 (2011) (citations omitted) (internal quotation marks omitted). The Court has also made clear that "the subjective views harbored by either the interrogating officers or the person being questioned are irrelevant." *Id.* at 271 (citation omitted) (internal quotation marks omitted); *see also Stansbury v. California*, 511 U.S. 318, 323 (1994) ("[T]he initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned.").[4]

---

[4] The State mounts a separate challenge to the second *Carner* factor, alleging that the factor was completely disavowed by the United States Supreme Court in *Stansbury v. California*, 511 U.S. 318 (1994). The State's argument overstates the holding in *Stansbury*. While the *Stansbury* court did directly consider a challenge to factors identical to the *Carner* factors, it only rejected the second factor to the extent that the factor required looking at the *subjective* beliefs of either the individual being interrogated or the officers. *Id.* at 326 ("[A]ny inquiry into whether the interrogating officers have focused their suspicions upon the individual being questioned (*assuming those suspicions remain undisclosed*) is not relevant for the purposes of *Miranda*." (emphasis added)). But it also emphasized that

> an officer's views concerning the nature of an interrogation, or beliefs concerning the potential culpability of the individual being questioned, may be one among many factors that bear upon the assessment whether that individual was in custody, but only if the officer's views or beliefs were somehow manifested to the individual under interrogation and would have affected how a reasonable person in that position would perceive his or her freedom to leave.

*Id.* at 325.

¶23 Strict or sole reliance on the *Carner* factors is inconsistent with the totality of the circumstances analysis prescribed by federal law. While these four factors may, at times, be relevant in a custody analysis, misplaced reliance on these factors can be highly problematic, especially where such reliance leads to conflicts with controlling law.[5] Each of the *Carner* factors should be considered when relevant, ignored when not, and given appropriate weight according to the circumstances.

¶24 Proper use of the *Carner* factors requires considering them in conjunction with all other relevant circumstances. As our court of appeals eloquently put it:

> We . . . consider the *Carner* factors, as well as any additional factors indicated by the Supreme Court, within the broader contextual picture . . . . And when, as a background matter, a person is subject to extensive, state-imposed restrictions on freedom of movement, the custody analysis should address all of the features of the interrogation, including the manner in which the interrogation [was] conducted.

---

[5] A recent series of cases from this court illustrates this same problem. In *State v. Shickles*, we demarcated factors that a district court should consider when determining whether evidence should be excluded under Utah Rule of Evidence 403. 760 P.2d 291, 295–96 (Utah 1988), *abrogated on other grounds by State v. Doporto*, 935 P.2d 484 (Utah 1997). After recognizing that "a number of courts have relied heavily on this list of factors in weighing evidence under rule 403," we abandoned rigid application of the *Shickles* factors. *State v. Lucero*, 2014 UT 15, ¶ 32, 328 P.3d 841, *overruled on other grounds by State v. Thornton*, 2017 UT 9, 391 P.3d 1016. We acknowledged that "while some of [the *Shickles*] factors may be helpful in assessing the probative value of the evidence in one context, they may not be helpful in another." *Id.* Thus, it is "unnecessary for courts to evaluate each and every factor and balance them together in making their assessment . . . because courts are bound by the text of rule 403, not the limited list of considerations outlined in *Shickles*." *Id.*

We do the same thing here—we are de-*Shickleizing* the *Miranda* custody analysis. Courts are bound by the totality of the circumstances test, not the *Carner* factors.

*State v. Reigelsperger,* 2017 UT App 101, ¶ 47, 400 P.3d 1127 (alteration in original) (footnote omitted) (citations omitted) (internal quotation marks omitted).

¶25  The Supreme Court recently highlighted some potentially relevant factors to consider, many of which are similar to the *Carner* factors: "the location of the questioning, its duration, statements made during the interview, the presence or absence of physical restraints during the questioning, and the release of the interviewee at the end of the questioning." *Howes*, 565 U.S. at 509 (citations omitted). And other Supreme Court cases have highlighted additional circumstances that may be relevant. *See, e.g., Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004) (considering other factors such as whether the police transported the interviewee to the station or required him to arrive at a specific time, whether the police threatened him with arrest, the focus of the questioning, and whether he wanted breaks).

¶26  Therefore, the proper initial step in determining whether an individual is entitled to *Miranda* warnings must start and end with whether a reasonable person, based on all of the objective circumstances surrounding the interrogation, would have felt free to terminate the interview and leave. Because we conclude that Mr. Fullerton would have felt free to leave, the first step of the custody analysis has not been met, we do not consider the second step.

### B. Mr. Fullerton was Not in Custody Under Miranda

¶27  Having set out the applicable standard for determining whether an individual is in custody for the purposes of *Miranda*, we turn to the core inquiry here—whether, based on "all of the circumstances surrounding the interrogation," "a reasonable person [in Mr. Fullerton's position] [would] have felt he or she was not at liberty to terminate the interrogation and leave." *Howes*, 565 U.S. at 509 (second alteration in original) (citations omitted) (internal quotation marks omitted).

¶28 Mr. Fullerton does not present a challenge under the totality of the circumstances. In fact, even though he claims that the *Carner* factors are controlling, he only discusses two factors. Ultimately, Mr. Fullerton points to three facts that he alleges show that he was in custody and was entitled to receive a *Miranda* warning: the officers' focus on him as a suspect, the accusatory nature of the questioning, and Captain Golding's suggestions that Mr. Fullerton would serve his best interests by cooperating with

the investigation because it would allow the Captain to tell the prosecutor and the judge that Mr. Fullerton told the truth.[6]

¶29 The requirement of a *Miranda* warning is not "imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect." *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977). And while the Supreme Court has recognized that "when investigatory questioning shifts to accusatory questioning, the existence of custody is likely because this often indicates to the defendant that he or she is not free to leave," we have said that even this factor alone is not enough to create custody. *State v. Levin*, 2006 UT 50, ¶ 36, 144 P.3d 1096; *see also Stansbury*, 511 U.S. at 325 ("Even a clear statement from an officer that the person under interrogation is a prime suspect is not, in itself, dispositive of the custody issue, for some suspects are free to come and go until the police decide to make an arrest."). Additionally, although it may be relevant, reminding a person being interrogated that a judge or prosecutor may take his or her truthfulness into consideration does not automatically equate to a finding of custody by itself. *See Mathiason*, 429 U.S. at 493, 495 (finding "no indication that the questioning took place in a context where respondent's freedom to depart was restricted in any way" even though the officer told the defendant "his truthfulness would possibly be considered by the district attorney or judge").

¶30 Simply put, Mr. Fullerton's factual allegations to show custody, on their own, stand on very shaky grounds. When these allegations are considered as part of the totality of the

---

[6] Specifically, Mr. Fullerton points to the following statement by Captain Golding:

> You've got one opportunity to help yourself out of this situation that you've gotten yourself into. We know that you're accountable; we know that you're responsible. We are just trying to figure out the degree to where you put your hands on that – that baby and caused the injuries that you caused. We know you caused the injuries, but we're still coming up short on how. Exactly what happened.

Additionally, Mr. Fullerton alludes to other, similar statements made during the interview.

circumstances, it becomes clear that a reasonable person in Mr. Fullerton's position would have felt free to terminate the interview and leave.

¶31  At an officer's request, Mr. Fullerton voluntarily had his father drive him to the police station; and his father waited at the station for him the entire time. *Cf. Yarborough*, 541 U.S. at 664 (noting that certain facts weighed against finding the defendant was in custody, including that "[t]he police did not transport [him] to the station or require him to appear at a particular time" and his "parents remained in the lobby during the interview"); *State v. Fuller*, 2014 UT 29, ¶ 45, 332 P.3d 937 ("[T]he fact that the interrogation took place in a police car is not dispositive of the custody issue and must be weighed against the defendant's voluntary choice to enter the car."). When Mr. Fullerton arrived at the station, he was escorted to an interview room where the door was shut, but, to his knowledge, never locked; he was never placed in handcuffs and no weapons were ever drawn. *Cf. id.,* 2014 UT 29, ¶ 48 ("No handcuffs were used, no guns were drawn, the doors to the car were unlocked, and [the defendant] voluntarily spoke with officers.").

¶32  Upon his arrival, Mr. Fullerton was assured at least three times that he was not under arrest and was free to leave—and each time he acknowledged the assurance and indicated understanding.[7] *Cf. Howes*, 565 U.S. at 515 ("[R]espondent was told at the outset of the interrogation, and was reminded again thereafter, that he could leave and go back to his cell whenever he wanted."); *Mathiason*, 429 U.S. at 495 (recognizing that the defendant "was immediately informed that he was not under arrest" as an "indication that the questioning [did not take] place in a context where respondent's freedom to depart was restricted in any way"); *United States v. Griffin*, 922 F.2d 1343, 1349 (8th Cir.

---

[7] To begin the interview, Captain Golding made the following statements to Mr. Fullerton: "I need to make sure you understand a few things, okay? One, you're not under arrest."; "You came in here voluntarily. We want to talk to you. You're free to leave at any time. Do you understand that?"; "So if you tell me you want to walk, that's okay."; and "[Y]ou understand you're free—you know, you're not in custody, okay?" Mr. Fullerton responded affirmatively to all these statements.

1990) ("The most obvious and effective means of demonstrating that a suspect has not been taken into custody . . . is for the police to inform the suspect that an arrest is not being made and that the suspect may terminate the interview at will." (citations omitted) (internal quotation marks omitted)); *Fuller*, 2014 UT 29, ¶ 49 (acknowledging the importance of the defendant being "told that he could leave at any time").[8]

¶33 Over the next ninety minutes, two plain clothes officers took turns questioning Mr. Fullerton, although they were never both in the room at the same time. *Cf. Berkemer v. McCarty*, 468 U.S. 420, 438 (1984) ("The fact that the detained motorist typically is confronted by only one or at most two policemen further mutes his sense of vulnerability."); *id.* (noting that "the aura of authority surrounding an armed, uniformed officer . . . exert[s] some pressure on the detainee to respond to questions"). In fact, they came in and out freely at least nine times during the interview — never locking the door behind them. Initially, the questions were all directed towards Mr. Fullerton helping the officers figure out what happened. *Cf. Yarborough*, 541 U.S. at 664 ("Instead of pressuring [the defendant] with the threat of arrest and prosecution, [the officer] appealed to his interest in telling the truth and being helpful to a police officer."). At the beginning of the interview, the officers "[thought] the child [was] going to be ok," and just "need[ed] to figure out what happened." According to the district court, the officers' investigation was "still in its early stages" and they "had not yet ruled out any of the other people at the house as possible suspects." *Cf. Fuller*, 2014 UT 29, ¶ 48 (noting that the defendant "was not the initial focus of the investigation, as officers learned that [the defendant] may have

---

[8] At least one circuit court has suggested that this factor should be given heightened consideration. In *United States v. Czichray*, the Eighth Circuit Court of Appeals reasoned that repeated assurances of a suspect's freedom "should not be treated merely as one equal factor in a multi-factor balancing test." 378 F.3d 822, 826 (8th Cir. 2004). The court also noted that "no governing precedent of the Supreme Court . . . holds that a person was in custody after being clearly advised of his freedom to leave or terminate questioning." *Id.*

been involved only after he openly admitted to possessing 'inappropriate' material").

¶34 As the interview went on, it became clear to the officers that Mr. Fullerton was providing them an ever-evolving and inconsistent story. As the district court here noted, the officers did not identify Mr. Fullerton "as 'a likely criminal culprit' . . . until [Mr. Fullerton's] account of the facts became inconsistent." At that point, the nature of the questions turned more accusatory. But even then, the officers never raised their voices. Moreover, as the district court highlighted, even when the officers suspected that Mr. Fullerton was lying, "the questioning was predominantly couched in terms of obtaining a rational explanation for [N.L.'s] injuries."

¶35 Although the officers never repeated their reassurances that Mr. Fullerton was free to leave, *cf. Howes*, 565 U.S. at 515, the officers never contradicted these assurances, nor did Mr. Fullerton make any request to leave or cease the questioning. After admitting that he had "pushed on [N.L.'s] back" and "something cracked," Mr. Fullerton said, "[b]ut now I'll probably go to jail and everything else." Detective Olmstead did not refute this statement; nor did he confirm it.[9] Mr. Fullerton was not formally placed under arrest until the conclusion of the interview.

¶36 Against the backdrop of all of the circumstances of the interview, we conclude that the district court correctly determined that Mr. Fullerton was not in custody for purposes of *Miranda*. Given the totality of the circumstances, a reasonable person would have felt free to terminate the interview and leave, despite being the target of the investigation and on the receiving end of accusatory questions. Therefore, we affirm the district court.

## II. VOLUNTARINESS OF THE CONFESSION

¶37 Mr. Fullerton contends that interrogation tactics used by Captain Golding and Detective Olmstead impermissibly induced

---

[9] Mr. Fullerton's subjective belief that he was going to jail is of no relevance to the custody inquiry. *See supra* ¶ 22 n.4. However, the objective circumstances surrounding Mr. Fullerton's statement and the officer's reaction may be relevant to how a reasonable person in Mr. Fullerton's position would have viewed his freedom to leave.

his confession. Specifically, Mr. Fullerton points to alleged misrepresentations made by interrogating officers regarding the strength of the evidence. While Mr. Fullerton does not cite a constitutional provision as a basis for his challenge, he cites *State v. Rettenberger*, which hinged on Fifth and Fourteenth Amendment Due Process claims. 1999 UT 80, ¶ 11, 984 P.2d 1009.

¶38 The United States Supreme Court has held that, under "the Due Process Clause[,] certain interrogation techniques, either in isolation or as applied to the unique characteristics of a particular suspect, are so offensive to a civilized system of justice that they must be condemned." *Colorado v. Connelly*, 479 U.S. 157, 163 (1986) (citation omitted) (internal quotation marks omitted). When assessing the constitutionality of a confession, a court must examine the "totality of [the] circumstances to determine whether [the] confession had been made freely, voluntarily and without compulsion or inducement of any sort." *Withrow v. Williams*, 507 U.S. 680, 689 (1993) (citation omitted) (internal quotation marks omitted). The prosecution bears the burden of "demonstrat[ing] by a preponderance of the evidence that the statement was made voluntarily based upon the totality of the circumstances." *Rettenberger*, 1999 UT 80, ¶ 45 (citation omitted).

¶39 "[U]nder the totality of [the] circumstances test, courts must consider such external factors as the duration of the interrogation, the persistence of the officers, police trickery, absence of family and counsel, and threats and promises made to the defendant by the officers." *Rettenberger*, 1999 UT 80, ¶ 14 (citations omitted). Courts must also consider internal factors such "as the defendant's mental health, mental deficiency, emotional instability, education, age, and familiarity with the judicial system." *Id.* ¶ 15 (citations omitted).

¶40 Mr. Fullerton again does not make a totality of the circumstances argument, but instead relies on alleged misrepresentations made by Captain Golding and Detective Olmstead regarding the strength of physical evidence to attack a single factor. But "[a] defendant's will is not overborne simply because he is led to believe that the government's knowledge of his guilt is greater than it actually is." *State v. Galli*, 967 P.2d 930,

936 (Utah 1998) (alteration in original) (citation omitted).[10] Unlike in *Rettenberger,*[11] the officers here did not assert "complete

---

[10] This is a reflection of the nature of a totality of the circumstances analysis. As the court of appeals has decided in multiple cases since *Rettenberger*, the mere presence of one or more of the factors does not automatically equate to a lack of voluntariness under the totality of the circumstances. *See State v. Leiva-Perez*, 2016 UT App 237, ¶¶ 14–30, 391 P.3d 287 (determining the confession was voluntary under the totality of the circumstances); *State v. Montero*, 2008 UT App 285, ¶¶ 12–16, 191 P.3d 828 (same); *State v. Werner*, 2003 UT App 268, ¶¶ 28–44, 76 P.3d 204, 211 (concluding that the confession was voluntary despite claims of misrepresentations about strength of evidence, threats of harsher penalties, and offers of leniency); *State v. Diaz*, 2002 UT App 288, ¶ 50, 55 P.3d 1131 (rejecting a lack of voluntariness argument that rested solely on alleged police misrepresentations).

*Rettenberger* provides a stark contrast to the circumstances in this case. Mr. Rettenberger, an 18-year-old with mental deficiencies, *Rettenberger*, 1999 UT 80, ¶ 37, was interrogated by police on two separate occasions, separated by a 24-hour stay in solitary confinement, *id.* ¶¶ 2–3. Interrogating officers brushed off requests to speak to a lawyer, made gross misrepresentations about evidence, and did not allow the defendant to use the restroom or speak to his mother. *Id.* ¶¶ 2, 4, 35. The officers told him that he faced the death penalty and his options would be death by lethal injection, firing squad, or hanging. *Id.* ¶ 30. The *Rettenberger* court ultimately found six objective factors that weighed toward finding a lack of voluntariness: police misrepresentations, *id.* ¶¶ 20–23, the use of the false friend technique, *id.* ¶¶ 24–28, threats and promises, *id.* ¶¶ 29–32, "extended periods of incommunicado interrogation," *id.* ¶ 33, denial of Mr. Rettenberger's requests to call his mother, *id.* ¶ 35, and not allowing Mr. Rettenberger to use the bathroom, despite his requests, *id.* Additionally, the court found several subjective factors that weighed toward a lack of voluntariness that made the objective factors more severe, including Mr. Rettenberger's maturity level, mental deficiencies, and parroted answers. *See id.* ¶¶ 37–44.

fabrications;" they merely overstated the strength of evidence and their knowledge of Mr. Fullerton's guilt.[12] Generally, police "half-truths" regarding the strength of evidence are not sufficient to overcome a defendant's free will. *Id.*

¶41 Additionally, this is the sole factor of the totality of the circumstances test that Mr. Fullerton attacks. Mr. Fullerton never makes arguments about other objective factors, such as the false friend technique, threats or promises, or the absence of counsel or family. Additionally, Mr. Fullerton does not discuss any of the subjective factors.

¶42 A review of the other factors suggests that the confession was indeed voluntary. The interrogation was relatively short, lasting only ninety minutes. Although Captain Golding implied that Mr. Fullerton may receive better treatment from a judge if he told the truth, Captain Golding did not overtly threaten Mr. Fullerton with a harsher sentence or make any promises of leniency. At no time until the end of the interview did Mr. Fullerton request to speak with his attorney or family members. The officers were persistent in challenging Mr. Fullerton's evolving account of events, but "we think it eminently reasonable that police officers challenge criminal suspects' questionable explanations in their pursuit of the truth and their efforts to solve crimes." *State v. Montero*, 2008 UT App 285, ¶ 13, 191 P.3d 828. Additionally, there is no evidence that Mr. Fullerton suffered from any pre-existing mental defects which would make him more susceptible to suggestive questioning.

---

[11] Although police officers had no actual physical evidence linking him to the crime, police told or suggested to Mr. Rettenberger that they had fingerprints, ballistic test results, blood samples, and more, all of which implicated the defendant. *Rettenberger*, 1999 UT 80, ¶ 21. The district court cataloged some thirty-six false statements made by police and found that the majority of these were not merely "half-truths" but "complete fabrications." *Id.*

[12] For example, Detective Olmstead's statement, "I know that baby was shaken," was not a "complete fabrication"—Dr. Walker had twice told the police that N.L.'s injuries were probably a result of violent shaking. *See supra* ¶ 5.

¶43 Given the weight of these other factors, we disagree that any alleged police misrepresentations here were sufficient to render the confession involuntary. Therefore, we affirm the district court's decision to admit Mr. Fullerton's testimony as voluntary.

¶44 Mr. Fullerton also asserts that his confession was unreliable and thus inadmissible as evidence. He cites no constitutional provision, rule of evidence, or Utah case law to support this proposition; and it is unclear from his briefing what he believes provides a basis for this claim. Instead, he relies exclusively on *Aleman v. Village of Hanover Park,* 662 F.3d 897 (7th Cir. 2011).[13] We find the present case readily distinguishable from *Aleman*[14] and thus decline to discuss further the issue of reliability.

---

[13] We believe that a close reading of *Aleman* shows that the opinion was ultimately relying upon the rules of evidence to keep the confession out. The *Aleman* opinion begins by recognizing a constitutional basis for keeping a confession out when the confession is "coerced and thus involuntary." *Aleman*, 662 F.3d at 906. The opinion goes on to recognize that "[t]he question of coercion is separate from that of reliability. A coerced confession is inadmissible . . . even if amply and convincingly corroborated." *Id.* (citations omitted). It then switches gears and states that "a trick that is as likely to induce a false as a true confession renders a confession inadmissible because of its unreliability even if its voluntariness is conceded." *Id.* at 907 (citing *Johnson v. Trigg*, 28 F.3d 639, 641 (7th Cir. 1994)). On this point, *Johnson* states that when the circumstances are such that "the resulting confession will be highly unreliable," the confession "should, like other highly unreliable evidence, be excluded from the defendant's trial," under Federal Rule of Evidence 403. 28 F.3d at 641 (citing FED. R. EVID. 403). The portion of *Aleman* upon which Mr. Fullerton relies is the portion discussing the reliability, and thus the admissibility, of that evidence under the rules of evidence.

[14] In *Aleman*, an interrogating officer falsely represented that doctors had concluded that the defendant's handling of a baby must have caused its injuries. 662 F.3d at 907. The defendant then "confessed" that he had injured the child. *Id.* The court explained that the defendant found himself in a logic trap that forced him to

18

### III. CHALLENGES TO EXPERT TESTIMONY

¶45 Mr. Fullerton raises four challenges to statements made by one of the State's medical experts, Dr. Hansen: (1) he did not receive notice of Dr. Hansen's testimony that crying is a common trigger for inflicted rotational injury; (2) the "common trigger" testimony does not support a medical diagnosis; (3) Dr. Hansen's opinion that Mr. Fullerton's admitted actions could have caused N.L.'s injuries violated a pretrial order preventing similar testimony; and (4) Dr. Hansen improperly suggested that "I don't believe that we've been told exactly what happened to N.L. yet."

¶46 This court has consistently held that "a defendant who fails to preserve an objection at trial will not be able to raise that objection on appeal unless he is able to demonstrate either plain error or exceptional circumstances." *State v. Larrabee*, 2013 UT 70, ¶ 15, 321 P.3d 1136 (citation omitted); *see also State v. King*, 2006 UT 3, ¶ 13, 131 P.3d 202. The defense did not object to any portion of the first three statements—these claims are unpreserved. Because the defendant has not argued plain error or exceptional circumstances, we do not consider the first three challenges.

¶47 Defense counsel did object to Dr. Hansen's fourth statement, and the trial judge sustained the objection. If Mr. Fullerton believed that sustaining his objection was an insufficient remedy, he had a duty to ask the judge to do more. *State v. Hummel*, 2017 UT 19, ¶ 120, 393 P.3d 314. "Where the judge gave him everything he asked for (sustaining his objection), he is in no position to ask for more on appeal." *Id.* Because Mr. Fullerton did not request any additional relief with his objection at trial, he is not entitled to any upon appeal.

### IV. CHALLENGE TO CLOSING ARGUMENT

¶48 Mr. Fullerton claims that the prosecutor violated his due process rights by saving his criticism of a witness's memory for closing arguments instead of raising them on cross-examination,

---

confess to shaking the baby. *Id.* Mr. Fullerton, however, did not fall into this same logic trap. Mr. Fullerton offered an evolving account of events with no less than seven different explanations for N.L.'s injuries. But, Mr. Fullerton never admitted to shaking the baby. We fail to see how Mr. Fullerton was logically compelled to confess to shaking the baby when he did not actually confess to doing so.

thereby denying Mr. Fullerton the ability to bring in the witness's prior consistent statements under Utah Rule of Evidence 801(d)(1)(B) and fostering a false impression of the evidence.

¶49 Defense counsel did not object to the closing argument at the time and only raised the objection in a motion for new trial. As already discussed, an objection not preserved at trial cannot be raised on appeal unless the proponent can show plain error or exceptional circumstances. *Supra* ¶ 46. As *State v. Larrabee* further explained, "with respect to appellate review of closing arguments . . . we will not examine the State's closing argument if the defendant failed to timely object to it." 2013 UT 70, ¶ 15, 321 P.3d 1136 (citation omitted) (internal quotation marks omitted). And an objection to closing arguments is not timely if it is filed in a post-trial motion. *Id.* ¶ 16.[15]

---

[15] This court has previously, in rare circumstances, considered on appeal unpreserved issues raised in a post-trial motion when the trial court decided the issue on the merits, rather than rejecting the issue as untimely. *See State v. Johnson*, 821 P.2d 1150, 1159, 1161 (Utah 1991) (holding that "a jury must be unanimous on all elements of a criminal charge for the conviction to stand" and decided before the current Utah Rules of Criminal Procedure were in effect); *State v. Belgard*, 830 P.2d 264, 265–66 (Utah 1992) (holding that "[i]mplicit in granting the post-judgment evidentiary hearing was the trial court's finding that there was cause to grant . . . relief [from waiver of preservation]").

But in *Larabee*, we explained that there are two important policy reasons behind requiring a defendant to timely object at trial: (1) it "affords the trial court an opportunity to address the claimed error, and if appropriate, correct it, thereby promoting judicial economy," and (2) it "prevents defendants from foregoing an objection with the strategy of enhancing the defendant's chances of acquittal and then, if that strategy fails . . . claiming on appeal that the [c]ourt should reverse, thereby encouraging fairness." 2013 UT 70, ¶ 15 (alterations in original) (citations omitted) (internal quotation marks omitted). And we concluded that "allowing defendants to preserve issues like prosecutorial misconduct through motions to arrest judgment would directly contradict the[se] purposes of the preservation rule." *Id.* ¶ 16. We reaffirm our holding in *Larabee* and emphasize that an objection

¶50 Because Mr. Fullerton did not raise his objection to this issue until his motion for a new trial and does not claim exceptional circumstances or plain error, we will not consider the objection here.

## CONCLUSION

¶51 We conclude that the district court was correct in denying Mr. Fullerton's motion to suppress his interview with police—he was not in custody and therefore not entitled to a *Miranda* warning and the confession he made was voluntary.

¶52 We decline to consider the other challenges Mr. Fullerton presents on appeal. Four of these issues were unpreserved at the district court level, and Mr. Fullerton does not argue that an exception to preservation applies. Mr. Fullerton objected to the fifth alleged issue, thereby preserving his challenge. However, the district court sustained his objection and he asked for no additional remedy at trial. He therefore can ask for no other remedy on appeal.

¶53 We affirm the district court.

--------

that could have been raised at trial cannot be preserved in a post-trial motion.