2021 UT App 124

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
ZACHARY LYNN GODDARD,
Appellant.

Opinion
No. 20190740-CA
Filed November 12, 2021

Third District Court, Salt Lake Department
The Honorable Royal I. Hansen
No. 171910247

Lori J. Seppi and Samantha R. Dugan, Attorneys
for Appellant

Sean D. Reyes and David A. Simpson, Attorneys
for Appellee

JUDGE DIANA HAGEN authored this Opinion, in which
JUDGES DAVID N. MORTENSEN and JILL M. POHLMAN concurred.

HAGEN, Judge:

¶1 Zachary Lynn Goddard entered a conditional plea to one count of possession of a dangerous weapon by a restricted person, reserving his right to appeal the denial of his motion to suppress evidence he alleges was obtained as a result of an unlawful search. On appeal, Goddard argues that the district court's factual findings on the motion to suppress are clearly erroneous and that the court should have granted the motion for three reasons: (1) officers conducted a *Terry* stop of Goddard without reasonable suspicion of criminal activity, (2) officers frisked Goddard for weapons without reasonable suspicion that he was armed and dangerous, and (3) officers subjected

Goddard to custodial interrogation without providing *Miranda* warnings. We reject these arguments and affirm.

BACKGROUND[1]

¶2 While on bike patrol, an officer and his partner were passing through an alley known to them as a "high-drug-use area." They spotted Goddard, alone, "kind of hunched over some items." Among those items were some twist wrappers that the officer recognized as drug paraphernalia. The officer testified that "a twist is a small user amount of a controlled substance"— usually "heroin or cocaine"—that is "tightly wrapped" in plastic and then "wrapped up in another plastic which is tightly tied." The color of the twist wrapper indicates which "drug is inside." The officer had been trained to recognize illegal drug use and drug paraphernalia and had learned "quite a bit" about identifying drug paraphernalia from patrolling the area around the alley, where he commonly saw paraphernalia strewn about. In particular, the officer was familiar with twists as he had observed "hundreds" of them in his career.

¶3 The officer testified that he suspected the twist wrappers belonged to Goddard because they were "directly in front" of him and close enough to reach. The only other people in the alley were some distance from the twists, "maybe 30 feet up or so and on the other side." The officer noticed that "one of the white twist wrappers," which "was directly underneath" Goddard, "appeared to be relatively clean," meaning "[i]t didn't appear that it had been there and had dirt on it . . . from being

---

1. When reviewing a district court's denial of a motion to suppress, "[w]e recite the facts in a light most favorable to the [district] court's findings." *State v. Montoya*, 937 P.2d 145, 147 (Utah Ct. App. 1997).

kicked around the alley for a little while." The officers walked toward Goddard, but as they approached, he "stood up" and attempted to "leave the area."

¶4　Based on these facts, the officers initiated a *Terry* stop[2] to investigate whether Goddard was engaged in drug-related activity. When the officers approached Goddard and asked for identification, he "appeared nervous" and "made some motion towards his chest." Specifically, the officer testified that Goddard "reach[ed] up towards" the "area above [his] breast line" and "point[ed] and motion[ed] as if he was going to continue and put his hand inside [his] coat." The officer testified that Goddard's actions "made us feel nervous," so his partner asked Goddard whether he had any weapons. Goddard told the officers that he had a gun "in his left coat pocket" and "moved his hand toward that." Goddard discontinued the motion only when the officers "told him to stop."

¶5　The officers told Goddard to put his hands above his head, and the partner reached into Goddard's left coat pocket, pulling out a handgun. The officers asked if Goddard had a concealed weapon permit, and Goddard admitted that he did not.[3] Then, after giving Goddard *Miranda* warnings, the officers arrested him.

---

2. "A *Terry* stop," or level two stop, "occurs when a police officer temporarily seizes an individual because the officer has a reasonable, articulable suspicion that the person has committed or is about to commit a crime." *State v. Perkins*, 2019 UT App 117, ¶ 15, 446 P.3d 145 (cleaned up).

3. At the time of the stop, carrying a concealed firearm without a permit violated Utah law, even if the person was at least 21 years

(continued…)

¶6 Relevant to this appeal, the State charged Goddard with crimes arising from his possession of the firearm. At the preliminary hearing, the officer testified regarding the stop and events leading up to Goddard's arrest.

¶7 Goddard later moved to suppress evidence of the firearm, along with his statements about having a gun and lacking a concealed weapon permit. Goddard argued that (1) the officers lacked reasonable suspicion of criminal activity to conduct a stop, (2) the officers frisked Goddard for weapons without reasonable suspicion that he was armed and dangerous, and (3) Goddard was subjected to custodial interrogation before receiving *Miranda* warnings.

¶8 After hearing testimony from the officer at the motion to suppress hearing,[4] the district court denied the motion. The court concluded that the officers had reasonable suspicion to stop Goddard. The court found that Goddard "was segregated from others" and "hunched over the drug paraphernalia," that the drug paraphernalia "was new and clean," and that Goddard and the drug paraphernalia were "isolated" because "there wasn't anyone else in the same vicinity." The court did not, however, explain its reasons for rejecting Goddard's challenges to the seizure of the gun or the pre-*Miranda* questioning.

---

(…continued)
old and could otherwise lawfully possess a firearm. *See* Utah Code Ann. § 76-10-504 (LexisNexis Supp. 2017).

4. Goddard attached the preliminary hearing transcript to his motion to suppress, placing the officer's earlier testimony before the district court as well. We refer to the officer's testimony from both hearings in reciting and applying the facts.

¶9 After the district court denied the motion to suppress, Goddard entered a conditional plea to possession of a dangerous weapon by a restricted person and reserved his right to appeal the ruling on the motion to suppress. The State dismissed the remaining charges. Goddard now appeals.

## ISSUES AND STANDARD OF REVIEW

¶10 Goddard challenges the district court's denial of his motion to suppress, contending that: (1) the court's factual findings supporting reasonable suspicion were clearly erroneous and, in any event, the stop was not "justified by reasonable suspicion that criminal activity was afoot and that [Goddard] was sufficiently connected to that criminal activity"; (2) the officers "did not have reasonable suspicion that Goddard was armed and presently dangerous" to justify a frisk for weapons; and (3) "Goddard was entitled to *Miranda* warnings before the officers" asked him "whether he had a firearm or a concealed weapon permit." (Cleaned up.) "We review a denial of a motion to suppress as a mixed question of law and fact and will disturb the district court's factual findings only when they are clearly erroneous, but we afford no deference to the district court's application of law to the underlying factual findings." *State v. Paredez*, 2017 UT App 220, ¶ 11, 409 P.3d 125 (cleaned up).

## ANALYSIS

### I. Reasonable Suspicion to Detain Goddard

¶11 Goddard contends that the officers lacked reasonable suspicion that he was involved in criminal activity and, therefore, were not legally permitted to detain him to investigate his connection to the drug paraphernalia. In challenging the district court's conclusion to the contrary, Goddard first argues

that the court's factual findings were clearly erroneous. Next, Goddard argues that even if the court's findings are supported by the evidence, those facts do not give rise to reasonable suspicion that criminal activity was afoot and that Goddard was sufficiently connected to that activity. We address both arguments in turn.

A.    The district court's findings are adequately supported by the evidence.

¶12    Goddard first challenges the factual findings supporting the district court's reasonable suspicion determination. We review a district court's factual determination under a "clearly erroneous" standard and in so doing, we "do[] not consider and weigh the evidence de novo." *State v. Walker*, 743 P.2d 191, 193 (Utah 1987) (cleaned up). Accordingly, the mere fact that we "might have reached a different result" when looking at the same evidence will not justify setting the findings aside. *Id.* (cleaned up). Rather, we "may regard a finding as clearly erroneous only if the finding is without adequate evidentiary support or induced by an erroneous view of the law." *Id.* (cleaned up). Under this standard, the district court's findings are not clearly erroneous.

¶13    The district court made three factual findings that Goddard challenges. First, the court found that, during the events in question, Goddard was "segregated from others" and that he and the drug paraphernalia "were isolated" because "there wasn't anyone else in the same vicinity." Second, the court found that the drug paraphernalia "was new and clean" at the time. Lastly, the court found that Goddard had been "hunched over the drug paraphernalia." The court's findings are adequately supported by the officer's testimony at both the preliminary hearing and the evidentiary hearing on the motion to suppress.

¶14    Goddard first challenges the court's finding that he was "segregated from others," he was "isolated," and "there wasn't anyone else in the same vicinity." Goddard argues that he was not isolated because the alley where he was stopped is "public." But the court did not find that Goddard was alone in a private space, only that Goddard and the drug paraphernalia were "segregated" or "isolated" relative to others in the alley. The officer testified that there were no people in Goddard's "immediate area" and that the closest group of people was sitting "maybe 30 feet up or so and on the other side" of the alley. The distance between Goddard and the other group of people supports the court's finding that, with respect to their proximity to the drug paraphernalia, Goddard was "segregated" and "isolated," and "there wasn't anyone else in the same vicinity." Thus, the court's finding is adequately supported by the officer's testimony and not clearly erroneous.

¶15    Goddard next challenges the court's finding that the drug paraphernalia was "new and clean." The officer testified that he had seen "hundreds" of twist wrappers in his career and confirmed that he commonly saw them strewn about the area where Goddard was sitting. In comparison, the paraphernalia directly underneath Goddard "appeared to be relatively clean." He explained that at least one of the twist wrappers had an "appearance of, I guess you say, maybe cleanliness. It didn't appear that it had been there and had dirt on it . . . from being kicked around the alley for a little while." Goddard argues that, "at most, th[is] evidence showed that [the officer] considered the wrapper to be relatively clean" and cannot support the district court's finding that the drug paraphernalia was "new and clean." We disagree.

¶16    The court could reasonably infer that the paraphernalia was "new and clean" based on the officer's experience with seeing twist wrappers in the area and his testimony that the twist observed directly underneath Goddard did not appear to

have been there for long. When the district court makes findings of fact, it is entitled to draw all reasonable inferences from the facts. *See State v. Moosman*, 794 P.2d 474, 476 (Utah 1990). Here, the officer testified that the twist did not have "dirt on it" from "being kicked around the alley for a little while," supporting an inference that it was "new," in the sense that it had been recently discarded, and "clean" in comparison to other paraphernalia that the officer commonly saw in the alley. Thus, the court's finding that the paraphernalia was "new and clean" is fully supported by reasonable inferences from the officer's direct testimony and is not clearly erroneous.

¶17 Finally, Goddard challenges the court's finding that he "was hunched over the drug paraphernalia," as opposed to other unidentified items. The officer testified that Goddard was "sitting on the ground in this alley and he was kind of hunched over some items and I observed drug paraphernalia directly underneath him." The district court could reasonably construe this testimony to mean that the drug paraphernalia was among those items over which Goddard was hunched. And when asked how close Goddard was to the twists, the officer confirmed that Goddard "was seated on the ground and he was hunched over and they were directly be—like in his area where he was hunched over, if that makes sense."[5] Based on this testimony, the district court's characterization of Goddard being "hunched over the drug paraphernalia" is not clearly erroneous.

---

5. The record also suggests that the officer may have physically demonstrated the wrapper's location relative to Goddard during his testimony. The deference afforded by the clearly erroneous standard recognizes that the "lower court often has a comparative advantage in its firsthand access to factual evidence." *Myers v. Myers*, 2011 UT 65, ¶ 32, 266 P.3d 806.

¶18    In sum, the court's factual findings were not clearly erroneous. Having determined the court's findings are adequately supported, we next turn to whether those facts supplied the officers with reasonable suspicion to detain Goddard.

B.    The officers reasonably suspected Goddard was engaged in criminal activity.

¶19    The Fourth Amendment protects citizens from "unreasonable searches and seizures." U.S. Const. amend. IV. "The Fourth Amendment is not, of course, a guarantee against *all* searches and seizures, but only against *unreasonable* searches and seizures." *United States v. Sharpe*, 470 U.S. 675, 682 (1985). Accordingly, the "touchstone of the Fourth Amendment is reasonableness." *Ohio v. Robinette*, 519 U.S. 33, 39 (1996) (cleaned up). "Whether a particular seizure is unreasonable depends upon the level of the encounter between the police officer and citizen and the justification for it." *State v. Jervis*, 2017 UT App 207, ¶ 14, 407 P.3d 1072.

¶20    The Utah Supreme Court has articulated three levels of "constitutionally permissible" police encounters. *See State v. Deitman*, 739 P.2d 616, 617–18 (Utah 1987). "A level one encounter is a consensual encounter, which does not implicate the Fourth Amendment." *State v. Bui-Cornethan*, 2021 UT App 56, ¶ 17, 490 P.3d 191 (cleaned up). "A level two encounter occurs when a police officer temporarily seizes an individual because the officer has a reasonable, articulable suspicion that the person has committed or is about to commit a crime." *State v. Applegate*, 2008 UT 63, ¶ 8, 194 P.3d 925 (cleaned up). A level three encounter "occurs when a police officer has probable cause to believe that a crime has been committed and effects an arrest of the suspect." *Id.* (cleaned up).

¶21 The State does not contend that the interaction between Goddard and the officers was a level one consensual encounter. Rather, it is undisputed that Goddard was subject to a level two investigative detention when the officers approached him. A level two encounter, otherwise known as a *Terry* stop, *see Terry v. Ohio*, 392 U.S. 1, 26–27 (1968), is reasonable only if the "officer's action was justified at its inception," and "the detention following the stop was reasonably related in scope to the circumstances that justified the interference in the first place," *Jervis*, 2017 UT App 207, ¶ 15 (cleaned up). Goddard does not challenge the scope of the detention; therefore, we analyze only whether the *Terry* stop was justified at its inception.

¶22 A *Terry* stop is justified at its inception so long as the officers have reasonable suspicion that the suspect "has been, is, or is about to be engaged in criminal activity." *State v. Worwood*, 2007 UT 47, ¶ 23, 164 P.3d 397 (cleaned up). Reasonable suspicion does not require officers to "rule out innocent conduct or establish the likelihood of criminal conduct to the same degree as required for probable cause." *Id.* We measure the articulated facts "in objective terms by examining the totality of the circumstances," *State v. Mitchell*, 2019 UT App 190, ¶ 11, 455 P.3d 103 (cleaned up), "and avoid the temptation to divide the facts and evaluate them in isolation," *State v. Markland*, 2005 UT 26, ¶ 11, 112 P.3d 507 (cleaned up). Thus, facts which might appear innocent on their own may "collectively amount[] to reasonable suspicion." *United States v. Arvizu*, 534 U.S. 266, 274–75 (2002).

¶23 Under the totality of the circumstances, the officers had reasonable suspicion that Goddard was engaged in illegal drug activity. While patrolling a "high-drug-use area," the officers spotted Goddard alone, "hunched over," with "new and clean" drug paraphernalia "directly underneath him." When Goddard saw the officers, he stood up and attempted to leave. Each of these facts contributed to the officers' reasonable suspicion.

¶24    First, Goddard's proximity to "new and clean" drug paraphernalia supported an objectively reasonable suspicion that he was actively involved in criminal activity. Goddard does not dispute that the officers recognized the twist wrappers as drug paraphernalia, but argues that the officers "identified nothing about Goddard that suggested his proximity to the litter was anything more than coincidence." But just because Goddard's proximity to the wrappers "was ambiguous and susceptible of an innocent explanation," does not mean that the officers lacked reasonable suspicion for the stop. *See Illinois v. Wardlow*, 528 U.S. 119, 125 (2000). Law enforcement need not "rule out the possibility of innocent conduct" when conducting a *Terry* stop. *Arvizu*, 534 U.S. at 277. Indeed, the Fourth Amendment "accepts the risk that officers may stop innocent people." *Wardlow*, 528 U.S. at 126. So long as the facts known to the officer support an objectively reasonable belief "that criminal activity may be afoot," *Terry*, 392 U.S. at 30, the officers are permitted to conduct a *Terry* stop to "resolve the ambiguity," *Wardlow*, 528 U.S. at 125. While there might have been an innocent explanation for why Goddard was "hunched over" drug paraphernalia "directly underneath him," the totality of the circumstances justified a brief detention to investigate and resolve that ambiguity.

¶25    Goddard argues that the presence of drug paraphernalia in this case did not give rise to reasonable suspicion because he "was merely in the vicinity of the discarded twist wrappers in a public area next to a parking lot where the wrappers could have been discarded by any member of the public." But in addition to seeing Goddard hunched directly over the twist wrappers, the officer noticed that at least one of the wrappers was "new and clean" and did not appear to have been on the ground in the alley for long, suggesting that it had been recently discarded. *Cf. State v. Vinh Ba Nguyen*, 212 P.3d 1284, 1288 (Or. Ct. App. 2009) (holding that officers lacked reasonable suspicion to stop a

group of people for drinking in a public park, in part, because there was no evidence as to whether the nearby beer cans "appeared to be brand new or old, facts from which it might be inferred how long the containers had been lying next to the tree"). And the people nearest to Goddard and the twist wrappers were approximately thirty feet away. Under these circumstances, it was reasonable to suspect that the wrapper had just been dropped by the person hunched directly over it.

¶26 In addition, the location of the stop further contributed to the officers' reasonable suspicion. While "[a]n individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime," officers may rely on "relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation." *Wardlow*, 528 U.S. at 124. Here, the fact that the alley was known as a high-drug-use area provided important context. When the officers saw Goddard hunched over what appeared to be a recently discarded twist wrapper in a location where drugs were commonly used, it increased the likelihood that he was actively using drugs or otherwise involved in drug-related activity.

¶27 To a more limited extent, Goddard's attempt to leave the area when the police approached also reinforced the officers' reasonable suspicion. While a suspect "has a right to ignore the police and go about his [or her] business," the suspect's "nervous, evasive behavior is a pertinent factor in determining reasonable suspicion." *Id.* at 124–125. When the officers spotted Goddard, he was seated and hunched over. Then, when the officers approached, he stood up and attempted to leave. Although Goddard did not engage in headlong flight—"the consummate act of evasion," *see id.* at 124—his sudden change of behavior suggested not only that he might be trying to avoid police interaction but also that he was trying to physically

distance himself from the evidence of criminal activity. This fact, standing alone, carries very little weight; but in combination with the officers' other observations, Goddard's apparent attempt to avoid police scrutiny and distance himself from the paraphernalia contributed to reasonable suspicion that he was involved in illegal drug activity. *Cf. State v. Duncan*, 43 P.3d 513, 521 (Wash. 2002) (en banc) (holding that officers lacked reasonable suspicion to stop a suspect for an open container violation, in part, because the record did not "indicate that [the suspect] stood or moved away from the bottle when he saw the police approach"). Under the totality of the circumstances, the officers were justified in temporarily detaining Goddard to investigate their suspicions.

¶28 In reaching this conclusion, we reject Goddard's argument that the officers had insufficient information to support a reasonable inference that he was in constructive possession of the twist wrappers. Goddard appears to contend that the only "alleged crime at issue here is possession of drug paraphernalia" because the officer "testified that he initiated the level two stop because he suspected Goddard of possessing one of the 'twist wrappers' discarded on the ground near him." Goddard points out that the crime of possession of drug paraphernalia under Utah Code section 58-37a-5(1)(a) requires proof of either actual or constructive possession. Although he acknowledges that "an officer does not need proof of constructive possession beyond a reasonable doubt to initiate a level two stop," he argues that there must be "a sufficient nexus between the person stopped and the paraphernalia for the officer to form a reasonable suspicion that the person stopped had both the power and the intent to exercise dominion and control over the paraphernalia." (Cleaned up.)

¶29 We reject Goddard's argument for two reasons. First, our reasonable suspicion analysis is not limited to the crime of possession of drug paraphernalia. Although the officer testified

that he suspected Goddard of possessing drug paraphernalia, the officer's subjective suspicions, while "a factor in the analysis," are not determinative. *See State v. Alverez*, 2006 UT 61, ¶ 15, 147 P.3d 425. Rather, we "consider police officers' subjective interpretation of the facts as part of an objective analysis" based on the "totality of the circumstances." *See id.* ¶¶ 14–15 (cleaned up).

¶30 Here, possession of drug paraphernalia was not the only criminal activity suggested by the totality of the circumstances. The officer testified that he had stopped Goddard because of "his proximity to the twists and my believing that it was likely the twist was his and then . . . the area, it was [a] known high-drug use-area." And the "new and clean" appearance of the twist suggested that Goddard had just discarded it. These facts not only supported a reasonable suspicion that Goddard was in possession of drug paraphernalia, but also gave rise to an objectively reasonable suspicion that Goddard was in possession of the recently unwrapped drugs, was in the process of using drugs, or was packaging drugs for sale. In other words, the circumstances objectively gave rise to reasonable suspicion of a variety of criminal activities relating to illicit drugs, not limited to possession of drug paraphernalia.

¶31 Second, Goddard's argument assumes that reasonable suspicion requires some basis for concluding that the suspect's conduct satisfies each element of a particular criminal code violation. Based on this assumption, Goddard argues that the question "is whether there was a sufficient nexus between the person stopped and the paraphernalia for the officer to form a reasonable suspicion that the person stopped had both the power and the intent to exercise dominion and control over the paraphernalia," as required to prove constructive possession of drug paraphernalia in violation of Utah Code section 58-37a-5(1)(a). (Cleaned up.) But neither our controlling case law nor persuasive authority from other jurisdictions supports the

assumption that there must be evidence to support each statutory element of a specific criminal offense for an officer to initiate a *Terry* stop.

¶32    The United States Supreme Court has not directly addressed the question of whether a *Terry* stop must be supported by reasonable suspicion of a particular offense. *See* 4 Wayne R. LaFave, *Search & Seizure* § 9.5(c) (6th ed. 2020) (noting that "the Supreme Court has never expressly ruled on" the question of "whether the available information must support a conclusion that there is reasonable suspicion of a particular offense . . . , or whether it should suffice that there is reasonable suspicion of criminality generally"). But *Terry* itself speaks in general terms of "criminal activity" and, although it refers to the investigating officer's "hypothesis that these men were contemplating a daylight robbery," the opinion does not suggest that the legality of the stop hinged on whether the officers' observations supported reasonable suspicion of each statutory element of that particular crime. 392 U.S. at 28–30. And subsequent Supreme Court decisions continue to speak in terms of reasonable suspicion of "criminal activity," of "legal wrongdoing," or "that criminal activity is afoot," not in terms of whether the police have reasonable suspicion of a particular statutorily defined crime. *See, e.g.*, *Arvizu*, 534 U.S. at 273; *Rodriguez v. United States*, 575 U.S. 348, 358 (2015).

¶33    Requiring officers to observe evidence of each element of a particular crime before making a *Terry* stop is also incompatible with the rule allowing officers to conduct a brief investigative detention based on reasonable suspicion that the suspect "is about to be engaged in criminal activity." *See United States v. Place*, 462 U.S. 696, 702 (1983). *Terry* itself involved a stop of "suspicious individuals [who] were not involved in the actual commission of a crime. Instead, the officers stopped the individuals out of concern that a crime was going to occur 'at some point.'" *State v. Martinez*, 2008 UT App 90, ¶ 13, 182 P.3d

385 (quoting *Terry*, 392 U.S. at 28). The Court recognized the governmental interest in "effective crime prevention and detection" and explained that "it is this interest which underlies the recognition that a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest." *Terry*, 392 U.S. at 22. Unlike an arrest, which requires that the officer be "apprised of facts sufficient to warrant a belief that the person has committed or is committing a crime," the lesser intrusion involved in a *Terry* stop is justified "absent that kind of evidence," *id.* at 26, so long as "the officer has reasonable, articulable suspicion that the person has been, is, or is about to be engaged in criminal activity," *State v. Simons*, 2013 UT 3, ¶ 21, 296 P.3d 721 (cleaned up). Because *Terry* allows officers to conduct a brief seizure based on reasonable suspicion that a crime is about to occur, it cannot require officers to observe facts that support each element of a completed crime.

¶34    Similarly, Utah courts have never required reasonable suspicion of each element of a specific statutorily defined crime for a *Terry* stop. To the contrary, our supreme court has upheld a level two stop where the officer had "reasonable, articulable suspicion that crime was afoot" even though the facts did not establish that any identifiable crime had been or was about to be committed. *See State v. Markland*, 2005 UT 26, ¶ 16, 112 P.3d 507. In *Markland*, a deputy received information from dispatch that someone was "screaming or crying out for help" near an apartment complex in the early morning hours. *Id.* ¶ 2 (cleaned up). About five minutes later, the deputy drove down a poorly lit, dead-end street next to the apartment complex where he saw Markland, alone, walking toward the dead end. *Id.* The deputy stopped Markland, told him "there had been a report of screaming in the area," and asked him whether he "had heard anything." *Id.* ¶ 3. When Markland denied hearing anything, the

deputy asked "where he was headed." *Id.* "Markland replied that he was walking home . . . approximately twenty blocks away." *Id.* The deputy, knowing that Markland was on a dead-end street and surmising it would "not lead him home," asked for identification and ran a warrants check. *Id.* ¶¶ 3–4. Markland claimed the deputy lacked reasonable suspicion to detain him. *See id.* ¶ 15. The Utah Supreme Court rejected his challenge, holding that the "detention of Markland was justified by a reasonable, articulable suspicion that crime was afoot and that Markland was connected to that crime." *Id.* ¶ 16. The facts justifying the stop in *Markland* do not point to any specific crime, let alone give rise to reasonable suspicion that each element of a specific crime was satisfied.

¶35 And the weight of authority from other jurisdictions holds that reasonable suspicion does not require particularized suspicion of a specific crime to conduct a *Terry* stop.[6] Even those

---

6. *See, e.g.*, *United States v. Guardado*, 699 F.3d 1220, 1225 (10th Cir. 2012) (holding that "[d]irect evidence of a specific, particular crime is unnecessary" for reasonable suspicion); *United States v. Pack*, 612 F.3d 341, 353, 357 (5th Cir.) (rejecting a defendant's argument that "a police officer's reasonable suspicion must be directed toward a particular crime" and holding that "police do not have to observe the equivalent of direct evidence of a particular specific crime in order to detain a lawfully stopped individual to investigate where there is reasonable suspicion of criminal activity"), *modified on denial of reh'g*, 622 F.3d 383 (5th Cir. 2010); *Derichsweiler v. State*, 348 S.W.3d 906, 916 (Tex. Crim. App. 2011) (distinguishing reasonable suspicion required for a stop from probable cause required for arrest and explaining that "it is not a *sine qua non* of reasonable suspicion that a detaining officer be able to pinpoint a particular penal infraction"); *State v. Perez-Jungo*, 329 P.3d 391, 397 (Idaho Ct. App. 2014) (continued…)

jurisdictions that do require more than reasonable suspicion of general criminal activity do not require the type of particularization that Goddard suggests is necessary. For example, the Oregon Supreme Court has held that, to justify an investigative detention, "the officers must reasonably suspect that the defendant has committed or is about to commit a specific crime or *type* of crime." *State v. Maciel-Figueroa*, 389 P.3d 1121, 1131 (Or. 2017) (en banc) (emphasis added). Even under that formulation, the officers here had reasonable suspicion that Goddard was engaged in a specific "type of crime," namely, a drug-related offense. The officer testified that he stopped Goddard because of "his proximity to the twists and my believing that it was likely the twist was his and then . . . the area, it was [a] known high-drug-use area." This testimony supports an objectively reasonable suspicion that Goddard was

---

(…continued)

("[R]easonable suspicion does not require a belief that any *specific* criminal activity is afoot to justify an investigative detention; instead, all that is required is a showing of objective and specific articulable facts giving reason to believe that the individual has been or is about to be involved in *some* criminal activity."); *State v. Leyva*, 250 P.3d 861, 870 (N.M. 2011) ("Suspicion of criminal activity need not necessarily be of a specific crime."); *State v. Harder*, No. 117,937, 2018 WL 5091883, at *3 (Kan. Ct. App. Oct. 19, 2018) ("*Terry* does not require an officer to have reasonable suspicion that a specific crime has been or will be committed" but "only requires reasonable suspicion that criminal activity may be afoot." (cleaned up)); *Simmons v. Commonwealth*, No. 2434-09-2, 2010 WL 4174730, at *3 (Va. Ct. App. Oct. 26, 2010) ("We do not require the officer to suspect a specific crime; rather, he must have a reasonable suspicion, based on objective facts, that the person is involved in criminal activity." (cleaned up)).

involved in a narrow set of crimes related to drug activity—and was far more particular than the reasonable suspicion that justified the stop in *Markland*.

¶36 In sum, the officers were entitled to stop Goddard because the circumstances gave rise to objectively reasonable suspicion that Goddard was engaged in criminal activity. To defeat Goddard's motion to suppress, the State was not required to establish reasonable suspicion of the exact crime the officers had subjectively suspected, nor were the officers required to observe facts supporting each element of a particular crime. Because the officers' observations supported a reasonable suspicion that Goddard was involved in drug activity, the officers were justified in briefly detaining Goddard to investigate whether a crime had been, was, or was about to be committed.

## II. Reasonable Suspicion to Seize the Gun

¶37 Goddard next contends the officers were not justified in searching him for weapons and seizing the gun because they lacked reasonable suspicion that he was armed and dangerous.[7] If during a lawful stop, a law enforcement officer has reasonable suspicion that the suspect is "armed and presently dangerous," an officer may "conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him" or others. *Terry v. Ohio*, 392 U.S. 1, 30 (1968). And "[i]f the officer discovers what he believes to be a weapon, he may reach inside the suspect's clothing and

---

7. This court requested supplemental briefing on the issue of whether the Fourth Amendment allows officers to protect their safety by temporarily seizing a known gun during an investigative detention even absent reasonable suspicion that the suspect is "presently dangerous." Because we can decide this case without resolving that question, we do not reach it.

remove it." *United States v. Harris*, 313 F.3d 1228, 1237 (10th Cir. 2002) (citing *Adams v. Williams*, 407 U.S. 143, 148 (1972)).

¶38    Our court has previously identified specific circumstances that could provide reasonable suspicion that an armed suspect is presently dangerous, including "an otherwise inexplicable sudden movement toward a pocket or other place where a weapon could be concealed" or "discovery of a weapon in the suspect's possession." *State v. Wilkinson*, 2009 UT App 202, ¶ 16, 216 P.3d 973 (quoting 4 Wayne R. LaFave, *Search & Seizure* § 9.6(a), at 628–30 (4th ed. 2004)). Such discovery may occur through the suspect's own admission "in response to the officer's question" as to whether the suspect is armed. *See United States v. Street*, 614 F.3d 228, 234 (6th Cir. 2010). The ultimate inquiry is whether the totality of the circumstances would "warrant [an officer] of reasonable caution in the belief that the action taken was appropriate." *Terry*, 392 U.S. at 22 (cleaned up).

¶39    Here, when Goddard reached toward the inside of his coat, subsequently admitted that he had a gun in his left coat pocket, and then moved his hand toward that pocket again, the officers had reasonable suspicion that Goddard was both armed and dangerous. Specifically, upon being detained by police on suspicion of drug activity, Goddard "reach[ed] up toward" the "area above [his] breast line," "point[ed]," and "motion[ed] as if he was going to continue and put his hand inside [his] coat." Then, in response to the partner's question about Goddard having any weapons, Goddard admitted he had a gun "in his left coat pocket" and "moved his hand toward that" pocket until he was ordered to stop. A detained suspect reaching toward a known firearm provides an officer with an objectively reasonable basis to believe that the suspect intends to use that weapon and therefore poses a danger to the officers.

¶40    Goddard argues that moving his hand toward his pocket "was not the kind of sudden or inexplicable movement that

would justify a frisk." To be sure, it is entirely possible that Goddard was merely reaching for his requested identification or gesturing to indicate where the gun was located in response to the officers' questions. But officers are not required to risk their safety in hopes that a suspect reaching toward a gun does not intend to use it. By simply disarming Goddard, the officers effectively defused the potential danger using the least intrusive means and without resorting to the use of physical force. Under the circumstances, it was reasonable to "protect the officer[s] and other prospective victims by neutralizing" the known weapon. *See State v. Warren*, 2003 UT 36, ¶ 13, 78 P.3d 590. Therefore, we affirm the district court's denial of Goddard's motion to suppress evidence of the gun.

### III. Custody for Purposes of *Miranda*

¶41    Goddard also contends that the district court should have suppressed his statements to police because he was subjected to a custodial interrogation before receiving *Miranda* warnings. Specifically, Goddard argues that he was "entitled to *Miranda* warnings before being questioned about whether he had a firearm and whether he had a concealed weapon permit."[8] Although the district court did not make findings on this issue, the undisputed facts show that Goddard was not in custody

---

8. Because it is not clear whether Goddard seeks to suppress only his incriminating statements or the gun itself, we note that a *Miranda* violation does not bar "the admission into evidence of the physical fruit of a voluntary statement." *United States v. Patane*, 542 U.S. 630, 636 (2004). Goddard has not argued that his admission regarding the presence of the gun was involuntary. Therefore, only the statements themselves are potentially subject to suppression.

when those questions were asked. Therefore, he was not entitled to *Miranda* warnings.[9]

¶42 The Fifth Amendment guarantees that a defendant will not be "compelled in any criminal case to be a witness against himself." U.S. Const. amend V. In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Court addressed the coercive pressures inherent in custodial interrogations where suspects are generally in "unfamiliar surroundings," "cut off from the outside world," and subjected to "sustained and protracted questioning" in a "police-dominated atmosphere." *Id.* at 445–46, 448, 450. As a prophylactic measure, the Court established the *Miranda* warnings requirement "to insure that the right against compulsory self-incrimination is protected." *Oregon v. Elstad*, 470 U.S. 298, 305 (1985) (cleaned up).

¶43 But *Miranda* warnings are required only "in those types of situations in which the concerns that powered the decision are implicated," namely "custodial interrogation." *Berkemer v. McCarty*, 468 U.S. 420, 435, 437 (1984). And, the Court clarified, "by custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *California v. Beheler*, 463 U.S. 1121, 1123 (1983) (per curiam) (cleaned up).

¶44 To determine whether a suspect is in custody for purposes of *Miranda*, "the initial step is to ascertain whether, in

---

9. Because we conclude that Goddard was not in custody when the officers asked him whether he had a firearm and whether he had a concealed weapon permit, we do not address whether these questions constitute "interrogation" for purposes of *Miranda* or whether an exception to the *Miranda* rule would apply in these circumstances.

light of the objective circumstances of the interrogation, a reasonable person would have felt he or she was not at liberty to terminate the interrogation and leave." *State v. MacDonald*, 2017 UT App 124, ¶ 21, 402 P.3d 91 (quoting *Howes v. Fields*, 565 U.S. 499, 509 (2012)). "Determining whether an individual's freedom of movement was curtailed, however, is simply the first step in the analysis, not the last." *Howes*, 565 U.S. at 509. "If 'an individual's freedom of movement was curtailed,' the focus turns to 'whether the relevant environment presents the same inherently coercive pressures as the type of stationhouse questioning at issue in *Miranda*.'" *State v. Fullerton*, 2018 UT 49, ¶ 31, 428 P.3d 1052 (quoting *Howes*, 565 U.S. at 509). In making this determination, a court must examine the totality of the circumstances surrounding the interrogation, "but the ultimate inquiry is simply whether there was a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Stansbury v. California*, 511 U.S. 318, 322 (1994) (per curiam) (cleaned up).

¶45 Focusing on the first step of this inquiry, Goddard argues that he was in custody because "a reasonable person in Goddard's position would not have felt free to leave." This statement is true enough, as a suspect "is not free to leave . . . during a *Terry* stop." *MacDonald*, 2017 UT App 124, ¶ 24. But "the freedom-of-movement test identifies only a necessary and not a sufficient condition for *Miranda* custody." *Maryland v. Shatzer*, 559 U.S. 98, 112 (2010). "Not all restraints on freedom of movement amount to custody for purposes of *Miranda*." *Howes*, 565 U.S. at 509.

¶46 Relevant here, the Supreme Court has held that "the temporary and relatively nonthreatening detention involved in a traffic stop or *Terry* stop does not constitute *Miranda* custody." *Id.* at 510 (cleaned up). The Court first addressed this issue in *Berkemer v. McCarty*, 468 U.S. 420 (1984). In that case, the Court "held that a person detained as a result of a traffic stop is not in

*Miranda* custody because such detention does not 'sufficiently impair [the detained person's] free exercise of his privilege against self-incrimination to require that he be warned of his constitutional rights.'" *Howes*, 565 U.S. at 510 (quoting *Berkemer*, 468 U.S. at 437). Although motorists at traffic stops are not free to leave, "two features of an ordinary traffic stop" alleviate the inherently compelling pressures at work in a custodial interrogation. *See Berkemer*, 468 U.S. at 437. First, such stops are "presumptively temporary and brief," and second, the "circumstances associated with the typical traffic stop are not such that a motorist feels completely at the mercy of the police." *Id.* at 437–38. "In both of these respects, the usual traffic stop is more analogous to a so-called *Terry* stop." *Id.* at 439 (cleaned up). "The comparatively nonthreatening character of detentions of this sort explains the absence of any suggestion in [Supreme Court] opinions that *Terry* stops are subject to the dictates of *Miranda*." *Id.* at 440; *see also State v. Mirquet*, 914 P.2d 1144, 1147 (Utah 1996) ("In the context of a routine traffic stop, the driver and the passengers, even though they have been stopped and, at least momentarily, are not free to leave, are not in custody for *Miranda* purposes." (cleaned up)).

¶47 Although *Terry* stops are presumptively non-custodial, the encounter may "evolve[] into a state of detention tantamount to a formal arrest." *State v. East*, 743 P.2d 1211, 1212 (Utah 1987). If an individual is temporarily detained but "thereafter is subjected to treatment that renders him 'in custody' for practical purposes, he will be entitled to the full panoply of protections prescribed by *Miranda*." *Berkemer*, 468 U.S. at 440. "The safeguards prescribed by *Miranda* become applicable as soon as a suspect's freedom of action is curtailed to a degree associated with formal arrest." *Id.* (cleaned up); *see also Mirquet*, 914 P.2d at 1147 ("[T]he standard is whether a defendant's freedom of action is curtailed to an extent associated with a formal arrest.").

¶48 Only one prior Utah case has analyzed a *Terry* stop to determine whether the detention escalated to a de facto arrest for purposes of *Miranda*. In *State v. Mirquet*, 914 P.2d 1144 (Utah 1996), our supreme court held that the defendant was in *Miranda* custody during a traffic stop after the officer asked him to enter the patrol car, "told him that it was clear he had been using an illegal drug," and directed him to either "retrieve the drugs from his car or the officer would." *Id.* at 1147. "To guide the decision as to when one is in custody and entitled to a *Miranda* warning prior to a formal arrest," the court in *Mirquet* evaluated the four factors set out in *Salt Lake City v. Carner*, 664 P.2d 1168 (Utah 1983): "(1) the site of interrogation; (2) whether the investigation focused on the accused; (3) whether the objective indicia of arrest were present; and (4) the length and form of interrogation." *Mirquet*, 914 P.2d at 1147 (cleaned up).

¶49 Our supreme court has since clarified that "[s]trict or sole reliance on the *Carner* factors is inconsistent with the totality of the circumstances analysis prescribed by federal law." *Fullerton*, 2018 UT 49, ¶ 23. "Each of the *Carner* factors should be considered when relevant, ignored when not, and given appropriate weight according to the circumstances" and must be considered "in conjunction with all other relevant circumstances."[10] *Id.* ¶¶ 23–24. Other potentially relevant factors

---

10. In *State v. Mirquet*, 914 P.2d 1144 (Utah 1996), our supreme court analyzed the *Carner* factors to determine whether, during the course of a presumptively non-custodial traffic stop, the defendant's freedom of movement was curtailed to a degree associated with formal arrest triggering the protections of *Miranda*. *Id.* at 1147. But in *State v. Fullerton*, 2018 UT 49, 428 P.3d 1052, the court identified the *Carner* factors as relevant to "[t]he first part of [the] inquiry—whether a reasonable person would have felt free to leave." *Id.* ¶ 22. Presumably, the *Carner* factors—

(continued…)

might include "'the location of the questioning, its duration, statements made during the interview, the presence or absence of physical restraints during the questioning, and the release of the interviewee at the end of the questioning.'" *Id.* ¶ 25 (quoting *Howes*, 565 U.S. at 509). "In determining whether an individual was in custody, a court must examine all of the circumstances surrounding the interrogation, but the ultimate inquiry is simply whether there was a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Stansbury v. California*, 511 U.S. 318, 322 (1994) (cleaned up).

¶50    In this case, none of the circumstances surrounding the stop suggest that Goddard was in *Miranda* custody before the officers administered *Miranda* warnings and placed Goddard under arrest. Neither the location nor the length and nature of the questioning distinguish this from a typical *Terry* stop. Goddard was stopped in a public alley in full view of other people. As the Supreme Court has explained, the "exposure to public view both reduces the ability of an unscrupulous policeman to use illegitimate means to elicit self-incriminating statements and diminishes" the suspect's "fear that, if he does not cooperate, he will be subjected to abuse." *Berkemer*, 468 U.S. at 438. The detention was remarkably brief, just long enough for the officers to ask Goddard for identification, whether he was armed, and whether he had a permit for the firearm he was carrying.[11] Although the "investigation focused on the accused,

_____

(…continued)

along with all other surrounding circumstances—may be relevant to both inquiries.

11. Goddard also argues that asking whether he was armed and whether he had a concealed weapon permit was coercive because it "was wholly unrelated to the reason for the *Terry* stop," not reasonably expected, and "was designed to elicit an

(continued…)

. . . that factor alone does not dispositively determine whether a person is in custody," *see Mirquet*, 914 P.2d at 1147–48, and does not distinguish Goddard's detention from an ordinary *Terry* stop. Importantly, none of the objective indicia of arrest were present. Goddard was not handcuffed, placed in a patrol vehicle, or told that he was under arrest before he was questioned about the firearm. The officers did not draw weapons or employ any other physical force, threats, or coercion. In short, there was nothing to distinguish this encounter from an ordinary *Terry* stop.

¶51 Goddard argues that the stop was nonetheless coercive because the officers "built an environment suggesting that Goddard was completely at their mercy and created the impression that Goddard would be held until he provided the answers they wanted." This characterization is not borne out in the record. Goddard was approached by only two uniformed police officers in a public alley, not in an inherently coercive setting such as an interrogation room of a station house. There is

---

(…continued)
incriminating response" and "produce incriminating evidence." But the United States Supreme Court has made it clear that asking questions unrelated to the reason for the detention is permissible during a *Terry* stop, so long as the questions do not measurably prolong the detention. *See Muehler v. Mena*, 544 U.S. 93, 101 (2005); *see also Arizona v. Johnson*, 555 U.S. 323, 333 (2009) ("An officer's inquiries into matters unrelated to the justification for the traffic stop . . . do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop."). Goddard does not contend that the two questions about weapons measurably prolonged his detention. Such permissible questioning does not distinguish Goddard's detention from a presumptively non-custodial *Terry* stop.

no suggestion that the officers brandished firearms, threatened Goddard, or employed any kind of physical force. Goddard was not handcuffed, physically restrained, or even placed in the back of a police vehicle for questioning. *Cf. Mirquet*, 914 P.2d at 1148 (holding that a defendant was in *Miranda* custody where, among other things, "the site of the interrogation was inside the police car," which "added to the coercive environment"). While "the aura of authority surrounding an armed, uniformed officer and the knowledge that the officer has some discretion in deciding whether to issue a citation, in combination, exert some pressure on the detainee to respond to questions," those features do not transform a *Terry* stop into a custodial arrest. *See Berkemer*, 468 U.S. at 438–39. A brief investigative detention, such as the one at issue here, is simply not the type of inherently coercive environment that *Miranda* guards against.

¶52　Although Goddard was not free to leave once the officers initiated a *Terry* stop, his freedom of action was not curtailed to a degree associated with formal arrest. And because Goddard was not in custody for purposes of *Miranda* when asked whether he was armed and whether he had a concealed weapon permit, the district court correctly declined to suppress his unwarned statements.

CONCLUSION

¶53　Under the totality of the circumstances, the officers were justified in briefly detaining Goddard to investigate their reasonable suspicion that he was involved in drug activity. After Goddard admitted he was carrying a firearm and twice moved his hand toward the gun, the officers acted reasonably in disarming him based on reasonable suspicion that he was both armed and dangerous. Lastly, because Goddard was not in custody when the officers asked whether he was armed and whether he had a concealed weapon permit, he was not entitled

to *Miranda* warnings at that point. Accordingly, we affirm the denial of Goddard's motion to suppress.

———