**2024 UT App 69**

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee
*v.*
SERGIO GIOVANI CORREA,
Appellant.

Opinion
No. 20220313-CA
Filed May 9, 2024

Fourth District Court, Heber Department
The Honorable Jennifer A. Mabey
No. 205500004

Wendy M. Brown, Debra M. Nelson, and Benjamin
Miller, Attorneys for Appellant

Scott H. Sweat and McKay King,
Attorneys for Appellee

JUDGE RYAN D. TENNEY authored this Opinion, in which
JUDGES RYAN M. HARRIS and AMY J. OLIVER concurred.

TENNEY, Judge:

¶1      Sergio Giovani Correa appeals the denial of a motion to suppress evidence that was obtained during an investigatory stop. This appeal asks us to decide whether an officer's knowledge that Correa did not have a valid driver license two months before the stop created a reasonable suspicion that Correa still didn't have a valid license and was therefore driving impermissibly. We hold that it did not. We accordingly reverse.

## BACKGROUND[1]

¶2    Late in the evening of January 30, 2020, a white truck was pulling onto a highway near Heber City when it passed an officer (Officer) who was out on patrol. As the vehicles passed each other, the "driver looked at" Officer and then "quickly looked away." Officer made a U-turn and began following the truck.

¶3    While following the truck, Officer ran its license plate through a police database. From this search, Officer learned the owner of the truck was a female but "that in recent history a Hispanic male name[d] Sergio Correa had been operating that vehicle without a license" and "that he'd been recently stopped and cited for it." Officer later clarified that by "recent," he meant "in the last two months," and he agreed that the offense could have been as far back as three months. As Officer continued to follow the truck, he tried "to get more information from dispatch [and] from other officers." During these efforts, Officer tried to pull up a photograph of Correa. Before he was able to pull up the photograph, however, the truck pulled into the parking lot of an apartment complex. At that moment, Officer had only been behind the truck "for a very short period" of "maybe two minutes," and he did not yet know who the driver was.

¶4    Officer followed the truck into the parking lot and parked nearby. When the driver exited the truck and "started to go into [the] apartment complex," Officer got out of his vehicle too, and he activated his overhead lights "as [he] was exiting" his vehicle. Officer then approached the driver on foot and engaged him in conversation. During that conversation, Officer learned that the driver was indeed Sergio Correa and that he did not have a valid

---

1. "In reviewing the trial court's ruling on a motion to suppress, we recite the facts in the light most favorable to the trial court's findings." *State v. Fullerton*, 2018 UT 49, ¶ 4 n.1, 428 P.3d 1052 (quotation simplified).

driver license. During the remainder of the conversation and an ensuing investigation, Officer obtained evidence that Correa was under the influence of drugs and was also in possession of both drugs and drug paraphernalia.

¶5 Based on this evidence, Correa was later charged with three counts of possession or use of a controlled substance, one count of driving with a measurable controlled substance in the body, one count of possession of drug paraphernalia, and one count of driving on a denied license.

¶6 Correa subsequently filed a motion to suppress "all evidence collected in this case, including officer observations, statements by the defendant, and chemical evidence taken from the defendant and its laboratory analysis." Correa argued that this evidence should be suppressed because he had been detained by Officer without reasonable suspicion, thus violating the Fourth Amendment.

¶7 Officer later testified at a suppression hearing. In his testimony, he confirmed that he had not "observe[d] any traffic violations, any infractions, or misdemeanors" at the time that he turned on his lights and approached Correa. When asked why he activated his lights and approached Correa, Officer responded: "I had an individual who matched the description of somebody who had been operating the vehicle in the past who did not have a license. He was leaving the area, [and] I wanted to make contact with him to determine his identity."

¶8 At the close of the hearing, the court issued an oral ruling denying the motion to suppress. The court expressed its view that although Officer "didn't recognize" Correa offhand, his "[k]nowledge that someone by the name of Mr. Correa had been driving that vehicle without a license fairly recently" was "enough to meet the minimum standard" to justify an investigatory stop. The court also opined that "licensing issues [are] often a situation where the condition . . . extends," so "if you

know someone's driving without a license . . . there is some likelihood that if you see them driving a vehicle, that perhaps they're driving again without a license."

¶9 Correa later pleaded guilty to two counts of possessing a controlled substance and one count of impaired driving, but he reserved the right to appeal the denial of his motion to suppress.

## ISSUE AND STANDARD OF REVIEW

¶10 Correa argues that the district court erred in denying his motion to suppress. We "review a district court's ruling on a motion to suppress for an alleged Fourth Amendment violation as a mixed question of law and fact." *State v. Hebeishy*, 2022 UT App 136, ¶ 12, 522 P.3d 952. "Specifically, we review the court's factual findings for clear error, and we review its legal conclusions, including its application of law to the facts of the case, for correctness." *Id.*

## ANALYSIS

¶11 The Fourth Amendment to the United States Constitution affirms that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." Under the Fourth Amendment, it "is settled law that a police officer may detain and question an individual when the officer has reasonable, articulable suspicion that the person has been, is, or is about to be engaged in criminal activity." *State v. Alverez*, 2006 UT 61, ¶ 14, 147 P.3d 425 (quotation simplified); *accord Kansas v. Glover*, 589 U.S. 376, 380 (2020) ("Under this Court's precedents, the Fourth Amendment permits an officer to initiate a brief investigative traffic stop when [the officer] has a particularized and objective basis for suspecting the particular person stopped of criminal activity." (quotation simplified)).

¶12 On appeal, Correa argues that Officer did not have reasonable suspicion that he was engaging in criminal activity before Officer detained him. We agree. Before explaining why, however, we briefly note two threshold questions that were briefed and argued but that we ultimately do not decide.

¶13 The first threshold question is when the seizure in this case occurred. Correa claims that he "was seized for purposes of the Fourth Amendment when [Officer] turned on his overhead lights." The United States Supreme Court has recently clarified, however, that "a seizure by acquisition of control" involves "either voluntary submission to a show of authority or the termination of freedom of movement." *Torres v. Madrid*, 592 U.S. 306, 322 (2021); *see also California v. Hodari D.*, 499 U.S. 621, 626 (1991). Here, even if we accept Correa's assertion that Officer made a "show of authority" when he turned on his lights, the record remains unclear as to whether Correa submitted at that moment or whether Correa instead only submitted when Officer approached him on foot and began the conversation. In any event, the State has not disputed Correa's implicit agreement that he was at least seized by the time the conversation began. And the record contains no indication that Officer learned anything of significance in between turning on his lights and beginning the conversation. For purposes of our analysis, we'll accordingly focus on whether Officer had reasonable suspicion at the time that the conversation began.[2]

---

2. Along these same lines, we note that while Correa and the State have both referred to the interaction at issue as a "traffic stop," Officer testified that he did not "pull [Correa] over" and that Correa had already parked and started walking toward the apartment complex when Officer turned on his lights. As a result, this case does not involve a "traffic stop" as that term is commonly understood. Instead, what's at issue is a seizure that occurred at some point after Correa was on foot.

¶14    The second threshold question is whether Officer had a reasonable basis for suspecting that the driver he saw in the white truck was the same "Sergio Correa" from the prior incident that Officer had learned about through the records search he conducted while following the truck. This question matters because the justification for the subsequent seizure was Officer's suspicion that (i) this driver was the same Sergio Correa and (ii) Correa still did not have a valid driver license. In the briefs and again at oral argument, the parties disputed whether Officer had enough information to suspect that this was the same person, and they also disputed whether ethnicity played an inappropriate role in this suspicion. In Correa's view, Officer engaged in impermissible racial profiling. In the State's view, however, Officer more benignly used ethnicity as a descriptive identifier to facilitate comparison with a known suspect.

¶15    We need not resolve this question either. For purposes of our analysis, we'll assume that Officer did have a reasonable and non-discriminatory basis for suspecting that the driver of this truck was the same Sergio Correa from the prior incident. But even with that assumption, we still conclude that the seizure was unlawful because Officer did not have a reasonable basis for suspecting that Correa was currently engaged in criminal behavior.

¶16    The justification given by the State and accepted by the district court was that Officer reasonably suspected that Correa was driving without a valid driver license. Indeed, on this front, the State first asserts that Officer had more than a mere *suspicion*. In its brief, the State argues that Officer "did, in fact, *know* the status" of Correa's driver license before he detained Correa. (Emphasis added.)

¶17    To support this argument, the State points to a moment in the suppression hearing in which Officer testified that "at the time [he] made personal contact" with Correa, he "knew the driver's

license status of Sergio Correa." But when read in context, that statement is less definitive than the State suggests.

¶18 At the suppression hearing, Officer said that he was able to follow the white truck for only "a very short period" of "maybe two minutes" before the vehicles pulled into the parking lot. Officer also testified that, during this "very short period," he had the "opportunity to run his license." In response to a clarifying question, however, Officer said that he ran a check on "the license plate on the vehicle, not [Correa's] driver's license." Officer then testified that during the brief period in which he was following the truck, he tried "to get more information from dispatch [and] from other officers." As part of these efforts, Officer tried to pull up a photograph of Sergio Correa. But by Officer's own account, he was unable to successfully "pull[] up a photograph of Mr. Correa" before the vehicles pulled into the parking lot and the two men engaged in conversation on foot. Aside from the records search on the truck, Officer never said that he completed any other records search.

¶19 Consistent with the information he apparently received from the search on the truck (which, again, informed him of an incident that had occurred about two months earlier), Officer repeatedly described his knowledge of Correa's license-status in past-tense terms. In one exchange, for example, Officer testified that he "knew that in the *recent history* a Hispanic male name[d] Sergio Correa had been operating that vehicle without a license; that he'd been *recently* stopped and cited for it." (Emphases added.) In another exchange, Officer testified that the driver he saw on the road "matched the description of somebody who had been operating the vehicle *in the past*" without a license. (Emphasis added.) This is also similar to how Officer described the same events in the probable cause statement that he wrote and signed on the day that he arrested Correa. There, Officer said that as he was following the truck, he ran a "records check of the [truck's] license plate" and that this records check showed that the

truck "had been *recently* operated by a male driver that did not have a valid license," and he further said that he then "attempted to pull a [Driver's] License picture of the *recently* offending driver." (Emphases added.)

¶20    From all this, it seems clear enough that when Officer said that he "knew the driver's license status of Sergio Correa," what he was referring to was his knowledge that the previously cited Sergio Correa did not have a license when he was pulled over in that truck about two months earlier. We see no place in the record where Officer ever said that he had managed to obtain any updated knowledge about Correa's driver license status before detaining him, much less where Officer explained how he obtained such knowledge during the very short period of time that was available to him. And of some note, the district court did not find that Officer had any updated knowledge either. To the contrary, after having heard the testimony at the suppression hearing firsthand, the court concluded that although Officer "didn't recognize" the driver, Officer's "[k]nowledge that someone by the name of Mr. Correa had been driving that vehicle without a license fairly recently" was "enough to meet the minimum standard" for an investigatory stop. And the court further reasoned that "if you know someone's driving without a license, that there is some likelihood that if you see them driving a vehicle, that perhaps they're driving again without a license." From this, it seems that the court also thought it needed to draw an inferential link between Officer's knowledge of Correa's past driver license status and his mere suspicion about Correa's current driver license status.

¶21    We'll accordingly view Officer's testimony the same way that the district court did: that what Officer knew was that Sergio Correa did not have a driver license two months earlier. From here, however, we part ways with the district court on the question of whether this justified the seizure.

¶22    The Fourth Amendment does not protect "against *all* searches and seizures, but only against *unreasonable* searches and seizures." *State v. Goddard*, 2021 UT App 124, ¶ 19, 501 P.3d 1188 (emphases in original, quotation otherwise simplified). In this sense, the "touchstone of the Fourth Amendment is reasonableness." *Id.* (quotation simplified). And when assessing reasonableness in a Fourth Amendment inquiry, courts seek to "balance[] the nature and quality of the intrusion on personal security against the importance of the governmental interests alleged to justify the intrusion." *State v. Hubbard*, 861 P.2d 1053, 1054 (Utah Ct. App. 1993) (quotation simplified).

¶23    As noted, an investigatory detention is permitted if an "officer has reasonable, articulable suspicion that the person has been, is, or is about to be engaged in criminal activity." *State v. Alverez*, 2006 UT 61, ¶ 14 (quotation simplified). And an "officer's suspicion is reasonable if it is supported by specific and articulable facts as well as any rational inferences drawn from those facts." *Id.*

¶24    No one disputes that, about two months earlier, Correa drove the truck without a license. But Correa had already been cited for doing so, and that past incident was now over. Also, as indicated above, Officer confirmed at the suppression hearing that he had not "observe[d] any traffic violations, any infractions, or misdemeanors" at the time that he turned on his lights and approached Correa. Given this, the question before us is whether Officer's knowledge that Correa had driven without a license about two months earlier allowed Officer to stop Correa based on a suspicion that Correa might be driving without a license again.

¶25    Our decision in *West Valley City v. Temblador-Topete*, 2020 UT App 64, 463 P.3d 721, is instructive. There, when an officer ran a records search on a vehicle, the database informed him that insurance registration for the vehicle was "not found." *Id.* ¶¶ 2, 10 (quotation simplified). Of note, this database was updated "twice

a month." *Id.* ¶ 5. Based on this information, the officer pulled the vehicle over, and during that stop, the officer discovered drugs on the driver. *Id.* ¶ 3. The driver subsequently appealed the denial of his motion to suppress, arguing, in part, that the information from the database was too "stale" to support the stop. *Id.* ¶ 18. We disagreed, concluding that "two-week-old information" was not too stale to support a reasonable suspicion of criminality. *Id.*

¶26    In doing so, we cited with approval language from a Tenth Circuit case holding that when

> the legal infraction at issue typically wears on for days or weeks or months (like, say, driving without a license or appropriate emissions and safety certifications), rather than concludes quickly (like, say, jaywalking or mugging), the timeliness of the information on which the government relies to effect an investigative detention recedes in importance compared to other factors, such as the type and duration of [the] offense at issue.

*Id.* ¶ 19 (quoting *United States v. Cortez-Galaviz*, 495 F.3d 1203, 1209 (10th Cir. 2007)).

¶27    We then quoted additional language from that same case recognizing that "'outer boundaries'" must "'exist for the usefulness of data, even for offenses typically protracted and ongoing in nature.'" *Id.* ¶ 20 (quoting *Cortez-Galaviz*, 495 F.3d at 1210). And at oral argument in this appeal, the State agreed that there must indeed be some temporal limitation on the continuing utility of information about the past license or insurance status of a driver. In response to a question from a member of this court, the State agreed that if Officer had learned that Correa did not have a valid license six months earlier, the State "would not stand here arguing that" the detention was justified.

¶28   And this must be so. After all, the Fourth Amendment's focus is on reasonableness, and courts are thus tasked with balancing "personal security against the importance of the governmental interests alleged to justify the intrusion." *Hubbard*, 861 P.2d at 1054 (quotation simplified). As we previously recognized in *Temblador-Topete*, and as we reiterate now, it simply couldn't be reasonable to hold that once a citizen is cited for driving without insurance or a license, police now have ongoing and indefinite authority to seize that citizen to see if the citizen is committing this same offense again.

¶29   To be clear, the State isn't asking us to hold as much. Instead, it is simply arguing that the information at issue here wasn't too stale to support this particular detention. As a result, we're confronted with something of a line-drawing problem. And our starting place for that assessment is *Temblador-Topete*, where we held that information about a driver's insurance status that was two weeks old could support a detention, and where we also cited with approval the Tenth Circuit's holding that "twenty-day-old" information can be relied on too. *Templador-Topete*, 2020 UT App 64, ¶ 19.

¶30   But even so, we conclude that this detention was unreasonable. The State's argument in this case seems to rest on two alternative assumptions—first, that it's reasonable to suspect that after a citizen is cited for driving without a license, the citizen won't promptly try to obtain a license; or second, that even if the citizen does try to promptly obtain a license, the citizen might not be able to complete the process within two months.

¶31   We see no reason to indulge the first assumption. It's of course true that a "determination that reasonable suspicion exists . . . need not rule out the possibility of innocent conduct." *State v. Simons*, 2013 UT 3, ¶ 21, 296 P.3d 721 (quotation simplified). But it's also true that reasonable suspicion "requires an *objectively reasonable* belief that an individual is engaged in or is about to be

engaged in criminal activity." *State v. Gurule*, 2013 UT 58, ¶ 32, 321 P.3d 1039 (emphasis added, quotation otherwise simplified). And the "touchstone" of a Fourth Amendment analysis is "always the reasonableness of the seizure." *State v. Smith*, 2022 UT 13, ¶ 16, 513 P.3d 629 (quotation simplified). In the absence of some additional information (such as a known history of this person repeatedly driving without a license), we don't think it is objectively reasonable for an officer to simply assume that after a citizen was previously cited for driving without a license, that citizen didn't fix the problem and is now committing that same offense again—much less to allow an officer to seize that citizen based solely on that assumption.

¶32 On the State's second assumption, we see no record support for it. The State has given us no indication that Officer even knew what the previous problem with Correa's license was. Had Correa never taken the requisite tests and never obtained a license at all? Was it instead a mere payment error? Was it something else? And whatever the problem was, the State has also provided no factual support for the assertion that Correa could not have corrected it within two months.

¶33 In short, we don't think it's reasonable to seize an otherwise law-abiding citizen based on nothing more than information that this citizen was cited for driving without a license two months earlier. Because the State has provided no other justification for the seizure at issue, we hold that it was not justified. We therefore reverse the district court's denial of Correa's motion to suppress.[3]

---

3. We briefly address one final potential issue. It's settled that, "absent an exception to the exclusionary rule, evidence obtained in violation of the Fourth Amendment's protections against unreasonable searches and seizures should be excluded." *State v.*

(continued…)

CONCLUSION

¶34 Because Officer seized Correa without a reasonable suspicion of ongoing criminal conduct, we reverse the district court's denial of Correa's motion to suppress. We thus remand the case for the district court to set aside the conditional guilty plea, as well as for further proceedings consistent with this opinion.

---

*Anderson*, 2015 UT 90, ¶ 8, 362 P.3d 1232 (quotation simplified). In its brief, the State suggests that Correa "has not provided the Court with an appropriate remedy" because, in the State's view, the exclusionary rule should not be applied in instances of "racial profiling" like the one alleged by Correa.

But as discussed above, we're not reversing on the basis of improper racial profiling. Rather, we're reversing because Officer did not have reasonable suspicion of ongoing criminal conduct. The State has given us no authority, and we see none, for declining to apply the exclusionary rule to a decision such as this one.